UNITED STATES of America, Plaintiff,

v.

CARGILL, INCORPORATED, Defendant.

Civ. A. No. 80–135.

United States District Court,
D. Delaware.

Feb. 12, 1981.

---

James W. Garvin, Jr., U. S. Atty., Peggy Ableman, Asst. U. S. Atty., Wilmington, Del., James W. Moorman, Asst. Atty. Gen., Dept. of Justice, Robert L. Bragar, Atty., EPA, Washington, D. C., and Margaret Cardomone, Atty., EPA, Region III, Philadelphia, Pa., of counsel, for plaintiff.

F. Michael Parkowski and John W. Noble of Parkowski, Noble & Guerke, Dover, Del., for defendant.

## OPINION

LATCHUM, Chief Judge.

In this case, the Court has had thrust upon it the conundrum of defining, in a particularly unusual and complicated situation, the respective roles of the state and federal governments in the enforcement of the Clean Water Act (the "Act"), 33 U.S.C. §§ 1251 *et seq.* The Act is representative of the class of statutory pronouncements which, while recognizing and providing for Federal primacy in their implementation and enforcement, also create (or preserve) a significant role for the states and private citizens. Thus, the tensions inherent in a federal system are recreated, if not exacerbated, by the Act, which ofttimes fails to create clear boundaries for the respective authorities of the federal government, the states and the people. *See American Iron and Steel Institute v. EPA*, 526 F.2d 1027, 1074 (C.A.3, 1975) (Adams, J., concurring). In approaching the particular problems posed by this case, this Court will attempt to keep in mind, Judge Goldberg's concluding remarks in *Save the Bay, Inc. v. Administrator of the EPA*, 556 F.2d 1282, 1296–97 (C.A.5, 1977):

> We have been called upon to examine a statutory scheme that has the potential for the optimum of federalism. The legislation contains problems of accommodation that will require additional interstitial interpretation and environmental exploration as the partners pirouette. The success of their federalist venture will

depend not only upon the grace, but also the substance of movement by both partners in the ballet. We have endeavored to ink a most self-effacing role for the federal judiciary, one which should foster a harmonious background to the dance and necessitate intervention only when a point of unmelodious discord seriously threatens the contrapuntal balance.

The present action was brought by the United States at the request of the Environmental Protection Agency ("EPA") under section 309 of the Act, 33 U.S.C. § 1319, against Cargill, Inc. ("Cargill"), a Delaware corporation, to enjoin Cargill from further violating the terms of a wastewater discharge permit issued to it pursuant to section 402 of the Act, 33 U.S.C. § 1342, and to impose civil penalties for past violations of that permit.[1] Jurisdiction is alleged to exist under 28 U.S.C. §§ 1345 and 1355 and 33 U.S.C. § 1319. Cargill without answering the complaint moved to dismiss, abate, or stay the action[2] or to abstain from assuming jurisdiction over the action on the ground that a still pending suit had previously been filed by the Delaware Department of Natural Resources and Environmental Control ("DNREC") in state court seeking identical relief. Cargill filed a brief in support of its motion[3] supported by affidavits and other documentary evidence,[4] in response to which the EPA filed an answering brief[5] and supporting evidence.[6] Cargill also filed a reply brief[7] with still other supporting evidence.[8] Oral argument was held on September 25, 1980 and the motion is now ready for decision.[9]

1. Docket Item ("D.I.") 1.

2. D.I. 5.

3. D.I. 6.

4. D.I. 6A.

5. D.I. 8.

6. D.I. 8A.

7. D.I. 9.

8. D.I. 9A.

9. The transcript of that hearing (hereinafter cited "Tr.") appears at D.I. 11.

Because of the delicate nature of the Court's task and the extraordinary circumstances giving rise to Cargill's motion, a somewhat extended discussion of the statutory and factual background of the case is necessary.

## I. Statutory Background: The Clean Water Act.

Congress clearly and unambiguously stated that the principal purpose of the Federal Water Pollution Control Act Amendments of 1972, Public Law 92–500, 86 Stat. 816, was to restore and maintain the purity of the nation's waters and eventually to eliminate the discharge of all pollutants into them. Section 101(a) of the Act, 33 U.S.C. § 1251(a) provides:

The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter—

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985; ....

The Congressional statement of policy also provides that while the primary responsibility for the administration of the Act was to lie with the Administrator of the EPA ("the Administrator"),[10] the "primary responsibilities and rights of States" to control water pollution and manage natural resources were to be recognized, preserved and protected,[11] and the participation of the public

10. Section 101(d), 33 U.S.C. § 1251(d) provides:
    Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter.

11. Section 101(b), 33 U.S.C. § 1251(b), provides:
    It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority

was to be provided for, encouraged and assisted.[12]

The means prescribed by the Act for implementing the primary goal of cleaning up the nation's waters reflects the Congressional intent to encourage cooperative federalism. However, the Act's imprecision in delineating the exact roles of the various participants has often done much to exacerbate federal/state tensions, as shown by the present case. *See EPA v. California,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *Cleveland Illuminating Co. v. EPA,* 603 F.2d 1 (C.A.6, 1979); *Save the Bay, Inc. v. Administrator of the EPA, supra; American Iron and Steel Institute v. EPA, supra*; "State/EPA Relations Severely Strained, General Accounting Office Report Says," 11 Env.Rep. Current Developments 649 (August 29, 1980). This basic statutory framework has been elucidated in a substantial number of cases. *See e. g., EPA v. National Crushed Stone Association,* —— U.S. ——, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980); *E. I. DuPont de Nemours & Co. v. Train,* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); *EPA v. California, supra; Weyerhaeuser Co. v. Costle,* 590 F.2d 1011 (C.A. D.C.1978).

The Act adopts the basic control strategy of limiting the emission of pollutants[13] from "point sources."[14] *EPA v. California, supra,* 426 U.S. at 204–205, 96 S.Ct. at 2024–2025; Rodgers, W. H., *Environmental Law* §§ 4.1 & 4.11 (1977) ("Rodgers"). It begins with the premise that all discharges of pollutants into United States waters are illegal and then specifies several narrowly drawn exceptions to that premise. Section 301(a) provides in pertinent part:

> Except as in compliance with this section and sections ... 1342 [section 402 of the Act] ... of this title, the discharge of any pollutant by any person shall be unlawful.

33 U.S.C. § 1311(a). Section 301(b) authorizes the Administrator to establish nationally applicable effluent limitations for categories of point sources.[15] 33 U.S.C. § 1311(b). These federally established limitations and other effluent limitations established pursuant to the Act are applied to individual installations through the mechanism of the National Pollution Discharge Elimination System ("NPDES") whose establishment is authorized by section 402, 33 U.S.C. § 1342.

under this chapter. It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution, and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

**12.** Section 101(e), 33 U.S.C. § 1251(e), provides:

> Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

**13.** The term "pollutant" is broadly defined in section 502(6), 33 U.S.C. § 1362(6).

**14.** A "point source" is defined as "any discernible, confined and discrete conveyance, ... from which pollutants are or may be discharged." § 502(14), 33 U.S.C. § 1362(14).

**15.** The § 301 effluent limitations were to be imposed upon existing point sources in two increasingly stringent steps. By July 1, 1977, existing point sources were required to have met effluent standards based upon "the application of the best practicable control technology currently available [BPCT] as defined by the Administrator." § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A). Then, by some date between July 1, 1984 and July 1, 1987, depending upon the date upon which the Administrator publishes the applicable limitations and guidelines, all point sources must meet standards based upon application of the "best available technology economically achievable [BACT] for such category or class ...." § 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A). The limitations are to be based upon regulatory guidelines established by the EPA pursuant to § 304, 33 U.S.C. § 1314. *EPA v. National Crushed Stone Association, supra,* 49 U.S.L.W. at 4008; *E. I. DuPont de Nemours & Co. v. Train, supra.*

Under the NPDES program, each discharger of pollutants is required to obtain a permit to discharge those pollutants. The permit must incorporate any applicable standards and requirements set in accordance with other sections of the Act, including the § 301 effluent limitations and certain water quality based limitations. In the absence of the "necessary implementing actions relating to all such requirements," the permit must incorporate such limitations and conditions "as the Administrator determines are necessary to carry out the provisions of" the Act. § 402(a)(1), 33 U.S.C. § 1342(a)(1).

Initially the EPA is authorized to administer the NPDES permit program. However, if a state establishes a program meeting the requirements set forth in section 402(b), 33 U.S.C. § 1342(b), and those contained in EPA regulations authorized by section 304(i), 33 U.S.C. § 1314(i) and now codified at 40 C.F.R. Part 122,[16] the Administrator must turn over the administration of the NPDES program over to that state. Among other statutorily imposed criteria which a state must meet in order to have an NPDES program approved is the requirement that a state have adequate enforcement authority to "abate violations of the permit ... program, including [authority to impose adequate] civil and criminal penalties." In regards to this requirement, section 309(d) of the Act, 33 U.S.C. § 1319(d), provides that dischargers violating NPDES permits shall be liable for civil penalties of as much as $10,000 per day of violation. Moreover, among the criteria established by the EPA in regulations enacted pursuant to section 304(i), 33 U.S.C. § 1314(i), are the following requirements relating to enforcement and penalties:

(c) Any civil penalty assessed, sought or agreed upon by the State Director under paragraph (a)(3) of this section shall be appropriate to the violation. A civil penalty agreed upon by the State Director in settlement of administrative or judicial litigation may be adjusted by a percentage which represents the likelihood of success in establishing the underlying violation(s) in such litigation.

\* \* \* \* \* \*

In the case of a penalty for a failure to meet a statutory or final permit compliance deadline, "appropriate to the violations," as used in this paragraph, means a penalty which is equal to:

(1) An amount appropriate to redress the harm or risk to public health or the environment; plus

(2) An amount appropriate to remove the economic benefit gained or to be gained from delayed compliance; plus

(3) An amount appropriate as a penalty for the violator's degree of recalcitrance, defiance, or indifference to requirements of the law; plus

(4) An amount appropriate to recover unusual or extraordinary enforcement costs thrust upon the public; minus

(5) An amount, if any, appropriate to reflect any part of the noncompliance attributable to the government itself; and minus

(6) An amount appropriate to reflect any part of the noncompliance caused by factors completely beyond the violator's control (e. g., floods, fires).

40 C.F.R. § 123.9(c).[17]

To date, the EPA has delegated the authority to administer the NPDES program to 33 states and the Virgin Islands. Delaware has an approved NPDES program, EPA having delegated the state the authority to administer the permit program in a Memorandum of Understanding dated March 7, 1974.[18]

Even after the Administrator has delegated authority over the NPDES system to a state, however, the Act provides for close

---

16. These regulations were promulgated at 45 Fed.Reg. 33290 (May 19, 1980).

17. The regulation is elaborated upon in EPA's Civil Penalty document (D.I. 8A, at A–1) which was published at 8 Env.Rep. 2011 (April 22, 1978). EPA adopted this policy with the object of increasing national uniformity and encouraging prompt compliance.

18. D.I. 6A, at A–1.

and continuing oversight and supervision of the state program by the EPA.[19] For example, each state with an approved NPDES permit program must transmit a copy of each permit application to the EPA, and must provide notice to the Administrator of every action related to the permit application, including advance notice of the issuance of each permit. § 402(d)(1), 33 U.S.C. § 1342(d)(1). If the Agency objects to a state's proposed action within ninety days, because the proposed permit violates the guidelines and requirements of the Act, no permit may issue. § 402(d)(2), 33 U.S.C. § 1342(d)(2). Moreover, EPA may withdraw its approval of a state NPDES program upon determining, after notice and opportunity to respond, that the program is not being administered in compliance with the requirements of section 402, 33 U.S.C. § 1342. *See* § 402(c)(3), 33 U.S.C. § 1342(c)(3). It was Congress's intention, however, that the EPA would exercise this latter power with restraint and reserve it for only extreme situations. For example, it is extremely doubtful that the unsatisfactory handling of a single permit would ever warrant EPA revocation of a state's NPDES authority. *See Save the Bay, Inc. v. Administrator of EPA, supra,* 556 F.2d at 1284–87, 1290.

The enforcement provision of the Act sets up a similar system, giving primary responsibility to the state with an approved NPDES system but reposing significant authority in the EPA to oversee the state's administration and to step in itself in appropriate situations. As discussed earlier, as an initial matter, a state must have enforcement authority commensurate with that given the EPA by the Act before a state NPDES program may be approved. Thus, enforcement by the state in the first instance is expected. Likewise, whenever the Administrator finds that any person is in violation of a condition or limitation contained in an NPDES permit, he is first required to notify the violator and the state, thus providing an opportunity for either voluntary compliance or state enforcement in the first instance. § 309(a)(1), 33 U.S.C. § 1319(a)(1). However, if "beyond the thirtieth day after the Administrator's notification the State has not commenced *appropriate* enforcement action" (emphasis added), the Administrator is required to assume enforcement responsibility himself and either issue a compliance order or bring suit in a United States District Court. § 309(a)(1), 33 U.S.C. § 1319(a)(1). Thus, if the state fails to bring an enforcement action altogether or if the enforcement action the state takes is inappropriate, the Administrator is required to act himself. These unambiguous words of the statute also indicate that the Administrator may bring a suit himself in federal court[20] even though the state has already filed an enforcement action in state court if the Administrator believes the state is not prosecuting that action "expeditiously and vigorously."

This latter view is further supported by judicial *dicta*, the Act's legislative history and other provisions of the Act. Although no court has held as such, the Ninth Circuit recently clearly stated its view that such

---

**19.** These provisions stem from Congress's determination in the 1972 amendments to the Federal Water Pollution Control Act to unify environmental control under the aegis of the federal government. Prior to 1972, the federal government's primary role was to assist the states and municipalities in meeting their own water pollution control problems. Federal regulation involved an excessively complex set of federal/state relationships, heavily balanced toward enforcement discretion on the part of the states. This arrangement stymied the initiation of environmental enforcement actions. During the period from 1948 to 1956, no environmental enforcement actions were initiated under the Federal Water Pollution Control Act by the federal government. It has been suggested that the absence of meaningful enforcement resulted from the great amount of political pressure which polluters could bring to bear on state agencies, which were then responsible for approving federal enforcement actions. *See* Barry, *The Evolution of the Enforcement Provisions of the Federal Water Pollution Control Act,* 68 Mich.L.Rev. 1103 (1970). However, each successive amendment of the Act since 1956 has enlarged the degree of federal authority over enforcement.

**20.** Such suits are authorized and federal jurisdiction over them is granted by section 309(b), 33 U.S.C. § 1319(b).

concurrent proceedings are authorized. In *United States v. I.T.T. Rayonier, Inc.,* 627 F.2d 996, 1001 (C.A.9, 1980), the court noted:

Section 1342(i) reserves EPA's authority to bring an enforcement action notwithstanding an approved state permit system with concomitant enforcement powers. Enforcement actions could have been filed concurrently in both state and federal courts. *See* 33 U.S.C. § 1319(b) (federal); 33 U.S.C. § 1342(b)(7) (state).

Later, the court stated:

If the EPA is dissatisfied with state enforcement efforts or the lack thereof it can revoke permit-issuing authority or bring an independent action in federal court.

*Id.* at 1002. Although not entirely clear, the commentary on section 309 in the legislative history also supports this view:

Against the background of the Clean Air Act and the Refuse Act the Committee concluded that the enforcement presence of the Federal government shall be concurrent with the enforcement powers of the States. The Committee does not intend this jurisdiction of the Federal government to supplant state enforcement. Rather the Committee intends that the enforcement power of the Federal government be available in cases where States and other appropriate enforcement agencies are not acting expeditiously and vigorously to enforce control requirements.

Senate Report No. 92–414, 92nd Cong., 2nd Sess., [1972] U.S.Code Cong. & Ad.News, 3668, 3730. The conclusion that the Administrator has the right to bring an action in federal court when the state has already commenced an identical action in state court which it is not diligently prosecuting is most strongly supported by the fact that the citizens' suit provision of the Act allows any citizen to bring an independent action unless the Administrator or the state is "*diligently* prosecuting a civil or criminal action ... to require compliance." § 505, 33 U.S.C. § 1365. To hold that a citizen could bring an independent suit even though a state suit was pending when the state suit was not being vigorously prosecuted[21] and to deny the Administrator such a right would yield the absurd result of denying the official charged with primary enforcement responsibility the same power which is granted to citizens.

In cases of a general failure of the state to enforce permit violations the Administrator has an even more extreme remedy available to him. In such case, the EPA has the authority, after making appropriate findings, to assume responsibility for all enforcement actions in that state. § 309(a)(2), 33 U.S.C. § 1319(a)(2).

It must be noted that Congress clearly indicated its intention that the Administrator use these various enforcement powers judiciously and bring Federal actions only in unusual situations:

The Committee again, however, notes that the authority of the Federal Government should be used judiciously by the Administrator in [if] those cases deserve Federal action because of their national character, scope, or seriousness. The Committee intends the great volume of enforcement actions be brought by the State. It is clear that the Administrator is not to establish an enforcement bureaucracy but rather to reserve his authority for the cases of paramount interest.

Senate Report No. 92–414, 92nd Cong., 2nd Sess., [1972] U.S.Cong. & Ad.News at 3730.

---

21. This situation was clearly contemplated by Congress. The legislative history notes:

It should be emphasized that if the agency had not initiated abatement proceedings following notice or if the citizen believed efforts initiated by the agency to be inadequate, the citizen might choose to file the action. In such case, the courts would be expected to consider the petition against the background of the agency action and could determine that such action would be adequate to justify suspension, dismissal, or consolidation of the citizen petition. On the other hand, if the court viewed the agency action as inadequate, it would have jurisdiction to consider the citizen action notwithstanding any pending agency action.

Senate Report No. 92–414, 92nd Cong., 2nd Sess., [1972] U.S.Cong. & Ad.News, 3746.

■ Thus, as the foregoing review of the statutory scheme reveals, Congress created, in the NPDES program, a system of concurrent state-federal jurisdiction. In this system, however, the leading role was granted to the EPA, which was to set the parameters of the state's authority, to determine the minimum standards for regulation, to oversee closely the state's implementation of the NPDES program, and to step in where in the Administrator's judgment it was necessary. Congress also clearly indicated its intention that the EPA use this extensive authority sparingly and only where necessary to preserve the integrity of the national effort to cleanse the nation's waters. With this in mind, the Court will now examine the facts leading up to this action.

## II.  *Factual Background.*

At all times pertinent to this lawsuit, Cargill has owned and operated the Paramount Poultry chicken processing plant which is located in Harbeson, Delaware.[22] That plant discharges its wastewater into the waters of Beaverdam Creek, a tributary of the Broadkill River, which are waters of the United States within the meaning of the Clean Water Act, § 502(7), 33 U.S.C. § 1362(7).[23]

Prior to the passage of the Act in 1972, the State of Delaware administered a permit program under which treated wastewater discharges from the plant were regulated. Initially a wastewater treatment lagoon system served as the primary means for treating waterborne wastes generated at the plant.[24] Following the passage of the Federal Water Pollution Control Act Amendments of 1972, the EPA Administrator issued Cargill a three-year NPDES permit on December 28, 1973.[25] This permit necessitated an expansion of Cargill's treatment system at a company reported cost of approximately $350,000.[26]

On January 28, 1977, after the first permit expired, DNREC, which had assumed authority over the NPDES program in 1974,[27] reissued an NPDES permit with more stringent terms and conditions than those incorporated into the first permit.[28] The permit, NPDES Permit No. DE 0000299, was modified and became effective November 9, 1977 and imposed limitations on emissions of various pollutants.[29] It also required the construction of certain control equipment, which was installed at a cost of $60,000.[30]

The EPA has not yet published guidelines or § 301 effluent limitations for the Poultry Processing Industry.[31] Therefore, DNREC set the terms and conditions of the permit in accordance with Delaware State DNREC regulations which establish minimum con-

---

22.  D.I. 1, ¶ 5. For purposes of this motion, the Court will assume the truth of all allegations contained in the complaint. As noted earlier, the Court will also rely on other materials submitted by both parties.

23.  D.I. 1, ¶ 6.

24.  D.I. 9A, at A–1, ¶ 4.

25.  D.I. 6A at B–1; D.I. 8A at C–1; D.I. 9A at A 2, ¶ 5.

26.  D.I. 9A at A–2, ¶ 5.

27.  On July 17, 1973, 59 Del.L. Chapter 212 was enacted to amend Title 7 of the Delaware Code so as to make the State eligible to administer its own NPDES program. On March 7, 1974, the EPA and the DNREC entered into a "Memorandum of Understanding Regarding Permit and Enforcement Programs Between DNREC and the Regional Administrator, Region III, En-

vironmental Protection Agency" whereby the authority to administer the NPDES program would be transferred to DNREC upon approval of the Administrator. (D.I. 6A at A–1).

28.  D.I. 1, ¶ 8; D.I. 9A at A–2, ¶ 6.

29.  D.I. 1, ¶¶ 8, 9 and 10, and Exhibit 1; D.I. 9A at A–2 to A–3, ¶¶ 7 and 8. The permit imposes limitations on biochemical oxygen demand (BOD5), total suspended solids, oil and grease, total phosphate as P, total coliform and pH (D.I. 1, Exhibit 1).

30.  *Id.*

31.  The Agency is gathering data to enable it to formulate such guidelines and limitations. 45 Fed.Reg. 48240 (July 18, 1980), 11 Env.Rep. Current Developments 461 (July 25, 1980).

trol standards for all industrial discharges.[32] Certain of the requirements incorporated in the Cargill permit were imposed due to the fact that at the time they were established DNREC was attempting to alleviate increasingly serious odor problems which had persisted at the plant for a considerable period of time and had occasioned numerous citizen complaints to DNREC in 1976 and 1977.[33] DNREC controls objectionable odors solely in accordance with state laws and regulations,[34] there being no applicable federal regulations. The odor problem was believed to be associated with Cargill's wastewater treatment system and modifications of that system were proposed as a solution to the odor problem. Because these modifications suggested an ancillary benefit from a wastewater treatment standpoint, the modifications were included as a requirement in the final NPDES permit.[35]

The odor problem persisted despite Cargill's construction of the waste treatment facilities required by the permit and despite certain other measures taken by Cargill at the direction of DNREC and incorporated into a voluntary Compliance Agreement.[36] In fact, the problem became even more severe, as reflected in renewed citizen complaints to DNREC and U. S. Congressman Pierre DuPont.[37]

In addition, the wastewater treatment system did not operate properly and on numerous occasions, Cargill discharged pollutants into Beaverdam Creek in excess of the limits specified by the permit.[38]

In response to these two problems DNREC initiated litigation, bringing two lawsuits in the Superior Court of Delaware for Kent County.[39] The first suit was filed on June 13, 1978, and alleged only violations of the Delaware State regulations governing the emissions of odors into the air (the "air suit").[40] The second, filed June 23, 1978, alleged numerous violations of the NPDES permit, including (a) numerous instances in which the discharge of pollutants exceeded permit limitations, (b) failure to complete construction of pollution control facilities required by the permit within the time required, and (c) failure to keep all treatment or control facilities in good working order and operation as efficiently as possible (the "water suit").[41] On the face of the two complaints, the two suits had nothing more in common than the plaintiff and defendant. The statutes and regulations invoked and the facts alleged were totally different. However, as a practical matter the two lawsuits were related and DNREC treated them as companion lawsuits because the solutions to the odor and water treatment problems were interrelated.[42]

Cargill answered both lawsuits and following the initial pleadings settlement negotiations were initiated. The result of such negotiations was a comprehensive proposal submitted by Cargill for resolving the odor problems as well as the related wastewater discharge problems. The basic thrust of the Cargill proposal involved the drain-

---

**32.** D.I. 9A at A–2, ¶ 6. The applicable regulation is DNREC Regulations Governing The Control of Water Pollution, Section 8.03. (D.I. 9A at D19–D20).

**33.** D.I. 9A, at A–2 to A–3, ¶ 7.

**34.** *Id. See* 7 *Del.C.* ch. 60 and Section 2.1 of Regulation XIX (D.I. 9A, Exhibit "1".)

**35.** D.I. 9A at A–3, ¶ 7.

**36.** D.I. 9A at A–3 to A–4, ¶¶ 7 and 8; D.I. 6A at C–1.

**37.** D.I. 9A at A–4, ¶ 8; D.I. 8A at F–1.

**38.** D.I. 1, ¶ 11; D.I. 9A at A–4, ¶ 9.

**39.** D.I. 9A at A–4, ¶ 9.

**40.** D.I. 6A at D–1.

**41.** D.I. 6A, at E–1.

**42.** D.I. 9A at A–4, ¶ 9. The connection was explained more fully by Cargill's counsel at oral argument. Apparently the odors emanate from sludge in Cargill's treatment lagoons and that problem can be eliminated in the short run by dredging the lagoons. "[T]he abatement program and [proposed] modifications of the treatment system incorporate provisions to prevent that type of situation from occurring again, particularly with respect to the sludge buildup on the bottoms of the lagoons." (D.I. 11 at 39–40).

ing of the wastewater treatment lagoons and removal of built-up sludge deposits which were the suspected source of the odor condition. As a means of controlling further sludge buildup and improving the overall wastewater treatment system performance, Cargill also proposed to study, design, and construct extensive modifications to the wastewater treatment system. Through negotiation, the proposal also included a complete review of in-plant practices for the purpose of determining means by which water use could be reduced and wastes removed prior to introduction to the treatment system. The EPA was aware of these proposals and in fact provided some input.[43]

DNREC decided that the best means of dealing with the settlement proposal was to enter into a comprehensive stipulation and order regarding the air suit while holding the water suit in abeyance as a bargaining stick pending successful completion of the abatement program.[44] A settlement was entered into in the air suit which basically incorporated the terms of the proposal and required the payment of a $5,000 fine as well. On its face, however, the settlement required only a study regarding a solution to the wastewater treatment problem. The study must include a proposed construction schedule, and although the settlement does not require compliance with the schedule, Cargill has made representations, both to this Court and on previous occasions, that it considers itself bound to complete the construction recommended by the study.[45] Although the settlement agreement related solely to the air suit, in a November 18, 1978 letter to Cargill, DNREC took the position that if, after a full year's cycle of operation, the actions undertaken by Cargill pursuant to the settlement resulted in a solution to the odor and water problems, DNREC would be willing to settle the pending water suit for a $5,000 penalty.[46]

Following the entry of the stipulated order in the air suit until the date that this action was filed, Cargill complied with the terms of the order and completed the following actions:

(a) Accumulated sludge on the bottom of the wastewater treatment lagoons was removed and disposed of at a reported cost of $342,000.

(b) A comprehensive study was undertaken by consultants hired by Cargill to determine in-plant and wastewater treatment practices and procedures deemed effective in minimizing odors and providing consistent effluent quality as related to NPDES permit requirements. The study incorporated suggestions made by the EPA following an inspection of the plant. A final report including a final design schedule and tentative construction schedule was submitted to DNREC in a timely manner.

(c) The report was approved by DNREC and Cargill applied for and on March 28, 1980, received a construction permit authorizing installation of the treatment system modifications recommended in the report. Cargill estimates that the modifications required by the settlement and recommended by the report will cost approximately $1.5 million.[47]

In the midst of this activity, on March 25, 1980, the EPA filed the present action, seeking an injunction requiring Cargill to comply with the terms of its permit, the imposition of civil penalties of $10,000 per day of past violation and such other relief as the Court deems proper.[48] This lawsuit was filed despite a specific request from DNREC that EPA not do so because of DNREC's belief that the federal action would interfere with the ongoing abatement program.[49] This fear was well founded. Cargill, as might be expected, advised both the EPA and DNREC that since it was

43. D.I. 9A at A–4 to A–5, ¶ 10.

44. D.I. 9A at A–5, ¶ 11, A–7 to A–8, ¶ 14.

45. D.I. 6A at G–1; D.I. 11, at 27–28, 44.

46. D.I. 6A at H–1.

47. D.I. 9A, at A–6 to A–7, ¶ 13; D.I. 6A at I–1; D.I. 6A at J–1.

48. D.I. 1, ¶ 16.

49. D.I. 9A at A–8, ¶ 15.

now faced with this second action seeking injunctive relief in federal court, it would be forced to discontinue work on the abatement program it was pursuing under the terms of the odor suit settlement because of its fear that, if imposed, a federal injunction could be inconsistent with the abatement program being pursued and render its efforts and expenses for naught.[50]

The EPA, by a letter of April 24, 1980 to DNREC, committed itself to the position that its requested injunctive relief in this action will not differ from the proposed pollution control equipment and construction schedule submitted by Cargill pursuant to the Consent Decree in the state odor suit.[51] EPA professedly brought this suit solely because it was dissatisfied with DNREC's prosecution of the suit in two respects. First, the EPA finds the enforcement deficient because DNREC in its stipulation of settlement to the odor suit did not make compliance with the proposed construction schedule mandatory. Secondly, and apparently most importantly, the FPA finds DNREC's proposed future penalty of $5,000 in settlement of the water suit grossly inadequate and contends that if the factors which must be considered under EPA's penalty policy, 40 C.F.R. § 123.9, are taken into account a proper penalty would be $405,000.[52]

It is under these unique circumstances that Cargill has moved this Court to stay or dismiss the action under the doctrine of abstention or in accordance with its own discretionary power and thereby cut the Gordian knot that has stymied all parties and impeded the accomplishment of the primary goal of the Clean Water Act—the cleansing of the nation's streams.

III. *Absention.*

■ The Court has first determined that the circumstances presented here clearly do not warrant staying or dismissing this suit on grounds of abstention. Abstention is a narrow exception to the duty of the federal

courts to adjudicate controversies over which they have jurisdiction and is warranted only in narrowly defined circumstances. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *McKnight v. Southeastern Pennsylvania Transportation Authority,* 583 F.2d 1229, 1241 (C.A.3, 1978). As outlined in *Colorado River Water Conservation Dist. v. United States, supra,* 424 U.S. at 814–17, 96 S.Ct. at 1244–46, the circumstances appropriate for abstention are confined to three categories: (a) cases such as *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), where a constitutional issue has been presented which might be mooted or presented in a different posture by a state court determination of unelucidated pertinent state law ("*Pullman* abstention"); (b) cases such as *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), where the exercise of federal jurisdiction would substantially interfere with a state's efforts to enforce a coherent system of purely state regulation bearing upon matters of significant importance to the state ("*Burford* abstention"); and (c) cases such as *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), where absent special circumstances federal jurisdiction is sought to restrain state criminal proceedings or state nuisance proceedings closely akin to criminal proceedings ("*Younger* abstention"). Cargill contends that the present case falls within all three categories. The Court disagrees.

■ As a preliminary matter, it is clear that this Court has jurisdiction over the matter. It has jurisdiction under 33 U.S.C. § 1319(b), § 309(b) of the Act. Moreover, as discussed earlier, in granting this jurisdiction, Congress clearly intended to create concurrent jurisdiction with the state courts and contemplated that in some instances, where appropriate, a federal enforcement suit could be maintained despite the pend-

50. D.I. 6A at K–3; D.I. 9A at A–7, ᶜ 13.

51. D.I. 8A at J–1; D.I. 11 at 30–32.

52. D.I. 11 at 30–36; D.I. 8, at 11–14.

ency of similar proceedings in state court. Jurisdiction also exists under 28 U.S.C. § 1345 which grants United States District Courts jurisdiction in cases where the United States is a plaintiff and under 28 U.S.C. § 1355 which grants United States District Courts exclusive jurisdiction in cases seeking the recovery of a penalty incurred under any Act of Congress.

It is equally clear that *Pullman* type abstention is unwarranted here. Cargill contends that its answer to the state water suit contains affirmative defenses which allegedly raise federal and state constitutional issues encompassing due process and equal protection considerations. Cargill points specifically to its first affirmative defense wherein it contends that enforcement of the permit "would result in arbitrary, capricious, and discriminatory treatment of defendant and would be without any rational economic or environmental basis." [53] Cargill further contends that the state court interpretation of the Delaware environmental statute (7 *Del.C.* ch. 60), the state regulations, and DNREC procedures might obviate the necessity of resolving the constitutional issues.

■ Application of the *Pullman* abstention doctrine requires that the party invoking it show three elements: (1) a serious constitutional claim, (2) the existence of an unsettled question of state law, and (3) the likelihood that an alternative construction of that law will make unnecessary, or substantially affect the ultimate resolution of the constitutional issue. *Zwickler v. Koota*, 389 U.S. 241, 250–51, 88 S.Ct. 391, 396–97, 19 L.Ed.2d 244 (1967); *Blake v. Kline*, 612 F.2d 718, 727–28 (C.A.3, 1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980); *McKnight v. Southeastern Pennsylvania Transportation Authority, supra* ; *Frederick L. v. Thomas*, 557

F.2d 373, 383 (C.A.3, 1977); *Three Rivers Cablevision, Inc. v. City of Pittsburgh*, 502 F.Supp. 1118 at 1122–23 (W.D.Pa.1980). Cargill has failed to do this. At a minimum the party invoking *Pullman* abstention should be able to articulate each of the three elements with sufficient particularity to enable the Court to evaluate the claim. Here, Cargill has baldly stated that an interpretation of relatively straightforward state laws and regulations might avoid a constitutional decision without specifying what interpretation of what specific law or regulation would do so and, in regards to the constitutional issue, only vaguely referring to due process and equal protection concerns.[54]

■ The Court also finds *Burford* type abstention singularly inappropriate in this case. *See Baltimore Bank for Cooperatives v. Farmers Cheese Cooperative*, 583 F.2d 104 (C.A.3, 1978). *Burford v. Sun Oil Co., supra*, was a suit brought to enjoin the execution of an order by a Texas State Commission allowing the drilling and operation of certain oil wells. The order challenged was part of a complex state regulatory system devised for the conservation of oil and gas in Texas—a system devised to deal with a particularly thorny problem which the federal government had chosen not to regulate but to leave to the states. In light of these facts and in light of the fact that federal courts had in fact interfered with the system by wrongly deciding state law on occasions in the past, the Supreme Court held that "a sound respect for the independence of state action requires the federal equity court to stay its hand" in such matters altogether. 319 U.S. at 334, 63 S.Ct. at 1107. It is evident that the policies underlying *Burford* are inapplicable to a suit such as the present one, brought by the EPA under the Clean Water Act. In

---

**53.** D.I. 6A at F–2.

**54.** Cargill relies upon *United States v. Interlake, Inc.*, 429 F.Supp. 193 (N.D.Ill.1977) where, in an action brought under the Clean Air Act (an Act employing a state/federal scheme of enforcement similar to that employed by the Clean Water Act), a federal district court stayed its action pending resolution of chal-

lenges to a state air regulation similar to the challenges raised by Cargill in the state water suit here. This Court disagrees with the *Interlake* court's application of the *Pullman* doctrine in those circumstances and, to the extent that case is not distinguishable from the present one, refuses to follow it.

this case, as noted earlier, Congress has enacted a pervasive federal system of regulation from which it has carved out an area for state regulation. The parameters of that state system of regulation have effectively been set by a comprehensive set of federal laws and regulations. Any state laws and regulations have been enacted in order to meet specific requirements contained in that federal law, and state authority can be removed altogether, under specified circumstances, by federal functionaries. The considerations underlying *Burford* abstention simply do not apply in such circumstances. The state has no exclusive control or expertise. Considerations of comity are certainly weakened and it would even seem that state courts would have no competence greater than federal courts in interpreting such laws. *Cf. Cuyler v. Adams,* —— U.S. ——, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981).

■ Cargill also contends that *Younger* type abstention is proper, relying upon *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1974). In *Younger* the Supreme Court held that federal courts should abstain from assuming jurisdiction where the jurisdiction is sought for the purpose of enjoining or directly interfering with pending state criminal proceedings. *Huffman* extended this rule also to require abstention to avoid similar interference with civil proceedings which are akin to criminal proceedings. The state proceeding in *Huffman* was a nuisance action seeking to close a theatre displaying allegedly pornographic films. The defendants to that state action had brought suit to enjoin the enforcement of the nuisance statute on the ground that it was unconstitutional. Cargill argues that because the state odor suit here is one to abate a nuisance and the federal water suit before this Court does not address this concern, there might be some interference with the state's efforts to abate a nuisance and *Younger* abstention is proper. The Court disagrees. Even assuming that *Younger/Huffman* type abstention would be proper where the state nuisance proceeding is based upon state environmental regulations, the Court finds that type abstention would be inap-

propriate here. This federal suit, unlike the suits in *Younger* and *Huffman,* has not been brought by a party to the state criminal or quasi-criminal proceeding and does not seek to restrain that proceeding by either enjoining it directly or collaterally attacking it. Rather, this suit has been brought by the federal government with the independent purpose of enforcing a federal law and will affect the state's enforcement efforts only in the remote possibility that the remedy imposed in the federal action will be inconsistent with the state imposed remedy. Thus, *Younger* abstention is inappropriate and the Court concludes that the application of the doctrine of abstention is not warranted on any grounds.

## IV. *Discretionary Stay or Abatement.*

Cargill contends that even if abstention is not proper here, the exceptional circumstances of this case warrant an abatement or stay of the action which is based upon "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River Water Conservation District v. United States, supra,* 424 U.S. at 817, 96 S.Ct. at 1246; *see also Landis v. North American Co.,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936). The Court agrees but believes that only a partial stay, limited in both time and subject matter is warranted.

■ It has long been recognized that federal district courts have the inherent discretionary power to stay proceedings pending the disposition of parallel proceedings in a second court. This power is incidental to the power of every court to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co., supra,* 299 U.S. at 254, 57 S.Ct. at 165. In *Colorado River Water Conservation Dist. v. United States, supra,* the Supreme Court held that this inherent power extended to the extreme remedy of dismissal or abatement. However, the Court

also indicated that the district court's discretion in this regard is narrowly circumscribed, and in general only with the presence of exceptional circumstances will the existence of concurrent state proceedings warrant the abdication of "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.*, 424 U.S. at 817–18, 96 S.Ct. at 1246; *In re S.S. Edgar M. Queeny* (C.A.3, 1980), slip op. No. 80–1338 (December 2, 1980); *Western Auto Supply Co. v. Anderson*, 610 F.2d 1126 (C.A.3, 1979); *see Meredith v. Winter Haven*, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943).[55]

The standards which must guide this Court's discretion in determining whether or not to dismiss or abate this action are the same which must guide its discretion in determining whether or not to grant a stay and, if so, the extent of the stay. Such a dismissal or abatement is, conceptually, merely the most extreme form of a stay. Wright, Miller & Cooper, 17 *Federal Practice and Procedure* § 4247 (1978); Wilson, M. M., *Federal Court Stays and Dismissals in Deference to Parallel State Court Proceedings: The Impact of Colorado River*, 44 U.Chi.L.Rev. 641 (1977). Indeed, in *Colorado River* when the Supreme Court stated the standard to be employed in deciding whether or not to grant a discretionary dismissal, it relied upon *Landis v. North American Co., supra*, the seminal case stating the standards which must govern a court's discretion in granting a stay. *Colorado River Water Conservation Dist. v. United States, supra*, 424 U.S. at 818–19, 96 S.Ct. at 1246–47.

◾ The burden is upon the party seeking a discretionary stay or dismissal to prove that an adequate justification exists for such action. *Landis v. North American Co., supra*, 299 U.S. at 255, 57 S.Ct. at 166; *Ohio Environmental Council v. United States District Court*, 565 F.2d 393, 396 (C.A.6, 1977); *Dellinger v. Mitchell*, 442 F.2d 782 (C.A.D.C.1971); *Castanho v. Jackson Marine, Inc.*, 484 F.Supp. 201, 209 (E.D. Tex.1980); *Kahan v. Rosenstiel*, 285 F.Supp. 61 (D.Del.1968). In this regard, the suppliant must demonstrate the existence of "exceptional circumstances" or "a clear case of hardship or inequity in being required to go forward" before a district court may stay its hand. *Colorado River Water Conservation Dist. v. United States, supra*, 424 U.S. at 817–19, 96 S.Ct. 1246–47; *Landis v. North American Co., supra*, 299 U.S. at 255, 57 S.Ct. at 166; *Western Auto Supply Co. v. Anderson, supra*; *Ohio Environmental Counsel v. United States District Court, supra*; *Dellinger v. Mitchell, supra*; *Castanho v. Jackson Marine, Inc., supra*; *Gentron Corp. v. H. C. Johnson Agencies, Inc.*, 79 F.R.D. 415 (E.D.Wis.1978).

◾ There is no set formula for determining the existence of exceptional circumstances. Although at a minimum there must be parallel proceedings, this alone is

**55.** Cargill has argued that *Will v. Calvert Fire Insurance Company*, 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978), stands for the proposition that a district court has broad discretion to abate or stay an action in a situation involving duplicative litigation. This contention is wrong in two respects. In *Will*, the Supreme Court reversed the Seventh Circuit Court of Appeals' issuance of a writ of mandamus requiring a district court to proceed with an action which it had stayed because of concurrent state proceedings. Because the Court of Appeals was reversed only by virtue of Mr. Justice Blackmun's concurrence, the narrow grounds of that concurrence represent the only majority opinion. Therefore, *Will* stands only for the proposition that before granting a writ of mandamus, the Court of Appeals ought to have remanded the case to the district court to allow that court to reconsider its decision to grant a stay in light of *Colorado River*, which had been issued since the stay had been granted but before the Court of Appeals issued the writ of mandamus. *Calvert Fire Insurance Co. v. Will*, 586 F.2d 12 (C.A.7, 1978). Indeed, Cargill's contention is not even supported by the plurality decision favoring reversal of the writ of mandamus. That opinion dealt solely with the question of whether it was proper to review a discretionary stay through a writ of mandamus and did not deal with the question of whether or not the district court had abused its discretion in granting a stay. The plurality indicated that review of the questions relating to the extent of the discretion and whether discretion had been abused ought to have been granted only through the medium of a "proper interlocutory appeal." 437 U.S. at 665, 98 S.Ct. at 2558. *See Western Auto Supply Co. v. Anderson, supra*, 610 F.2d at 1127.

insufficient to warrant the grant of a stay or dismissal. *In re S.S. Edgar M. Queeny, supra*; *Safeco Ins. Co. of America v. Guyton*, 443 F.Supp. 10, 12 (C.D.Cal.1978); *Gentron Corp. v. H. C. Johnson Agencies, Inc., supra*, 79 F.R.D. at 418. Beyond this the Court must consider all relevant factors, engaging in a balancing process. In this process, however, the unflagging obligation to exercise jurisdiction is a factor to be given heavy weight:

> No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required.

*Colorado River Water Conservation Dist. v. United States, supra*, 424 U.S. at 818–19, 96 S.Ct. 1246–47. Among the various factors that have been considered in other cases are the inconvenience of the federal forum, *Colorado River Water Conservation Dist. v. United States, supra*, the desirability of avoiding piecemeal litigation, *id.*, the order in which jurisdiction was obtained by the concurrent forums, *id.*, the existence of a federal policy militating either in favor or against such a stay, *id., Union Electric Co. v. EPA*, 593 F.2d 299, 304–305 (C.A.8), *cert. denied*, 444 U.S. 839, 100 S.Ct. 76, 62 L.Ed.2d 50 (1979), the identity of issues in the two forums or lack thereof, *United States v. West Penn Power Co.*, 460 F.Supp. 1305 (W.D.Pa.1978), and the existence of an important countervailing federal interest which federal courts might be more likely than state courts to respect or enforce. *Bio-Analytical Services, Inc. v. Edgewater*, 565 F.2d 450 (C.A.7, 1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978).

■ The district court's discretion is also narrowly circumscribed in regards to the extent of the relief which may be granted. The court must grant the narrowest stay which is warranted in light of the justifications which require the court to stay its hand. The relief granted must, to the greatest extent possible, be limited temporally:

> The stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description. When once those limits have been reached, the fetters should fall off.

*Landis v. North American Co., supra*, 299 U.S. at 257, 57 S.Ct. at 167; *accord, Taunton Gardens Co. v. Hills*, 557 F.2d 877 (C.A.1, 1977); *Ohio Environmental Council v. United States District Court, supra*; *Dellinger v. Mitchell, supra*. The stay must also be limited to the greatest extent possible in its scope and should restrain only those aspects of the case which give rise to the effects which justify its grant. *Dellinger v. Mitchell, supra*, 442 F.2d at 787; *see Nature Conservancy v. Machipongo Club, Inc.*, 579 F.2d 873 (C.A.4), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978). For these reasons, a complete abatement or dismissal, being the most extreme form of a stay, is particularly disfavored and warranted only where lesser intrusions on the litigants' right to proceed are not feasible.

■ The facts of this case, discussed at length earlier, readily lead to the conclusion that, while a stay is necessary, it must be a limited one. The following factors in varying degrees favor the grant of some sort of stay: (a) the avoidance of federal/state friction, (b) the greater familiarity on the part of the state with the factual background of the case, (c) the state's interest in the enforcement of its air pollution laws and regulations, (d) the presence of parallel state litigation and the existence of adequate statutory and regulatory authority at the state level to protect the public interest, (e) the need to conserve judicial resources, (f) congressional intent that primary responsibility for enforcement of the NPDES program rest with the state, and (g) the fact that, as a practical matter, the United States by seeking injunctive relief in the present suit has brought Cargill's construction efforts to a halt and is thus thwarting the principal goal of the Clean Water Act— the prevention of water pollution. While all of these factors directly bear on the

Court's decision to grant a limited stay, the last factor carries the greatest weight. The fact that the present suit is preventing the expeditious cleansing of our nation's waters is the only truly exceptional factor presented here. *See Union Electric Co. v. EPA, supra,* 593 F.2d at 304–305.

There are also other factors which weigh in favor of not suspending the suit, including (a) this Court's heavy obligation to exercise the jurisdiction granted it, (b) the fact that, as a practical matter, the injunctive relief sought by EPA does not differ from that sought by the state and agreed to by Cargill and hence, there does not appear to be a serious possibility of conflicting obligations being placed upon Cargill, (c) the fact that there are no enforceable requirements that Cargill install pollution control equipment, (d) congressional intent that there be some cases where dual state/federal enforcement actions be brought, (e) the congressional grant of discretion to the Administrator as to when such suits should be brought, (f) the EPA's interest in overseeing enforcement at the state level and ensuring uniformity, (g) the fact that the EPA is not a party to the state litigation and it is seeking a different remedy from the one the state will settle for, and (h) the EPA's interest in ensuring that adequate and uniform penalties be sought under its penalty policy.

The latter two factors are particularly weighty, because of the very large difference in opinion between DNREC and the EPA regarding the appropriate fine to be sought in the future. If the EPA is barred from assessing the penalty by a complete stay and the DNREC settles its water suit for $5,000 after one year of successful operation of the new Cargill facilities as proposed, there is a possibility that EPA would be barred from seeking a larger penalty by

the doctrine of collateral estoppel. *See United States v. I.T.T. Rayonier, Inc., supra.*[56] In such case the concerns relating to national uniformity and adequate deterrence underlying the EPA's penalty policy would be disserved.

Cargill contends that EPA's civil penalty policy ought not be considered as a factor because the policy was implemented contrary to federal legislative intent. Specifically, Cargill notes that when Congress was considering the Clean Water Act Amendments of 1977 it rejected a portion of a section of the Senate version of the Bill (S.1952), section 319, which would have allowed the Administrator to assess administratively a non-compliance fee, which a polluter would periodically have to pay as long as it failed to install proper abatement equipment. *See* House Conference Report No. 95–830, 95th Cong., 1st Sess., [1977] U.S.Code Cong. & Ad.News, 4326, at 4424, 4470 and 4471.[57] This provision, which would have provided for an administratively assessed fee which, although judicially reviewable, attached automatically and applied prospectively is unrelated to the EPA's penalty policy, which relates to the amount an enforcement authority should either be willing to settle for or should seek to have a court impose as a penalty for past infractions. The rejected portion of the Senate Bill would have provided the Administrator with an additional enforcement tool. Thus, the congressional rejection of the non-compliance fee cannot by any means be deemed a rejection of the policies underlying EPA's penalty policy. Cargill also argues that EPA's penalty policy ought not be considered as a factor because the facts of this case indicate that the fine sought by the EPA would not in fact further the concerns underlying the penalty policy.[58] This argument concerns factual

---

56. The applicability of collateral estoppel does, however, remain an open question. In light of the differences in interest between DNREC and EPA, it may be that DNREC could not be considered the virtual representative of EPA and EPA would not be bound by its settlement. *Id.*

57. A copy of the pertinent provisions appears in D.I. 9A at B–1.

58. Specifically Cargill contends that the assessment of a fine would not promote national uniformity in light of the fact that no § 301 limitations have been set for the poultry processing industry.

 

issues which ought to be considered by the Court in assessing any possible fine and should not be considered by the Court in its decision as to whether to stay the action and thus foreclose altogether the opportunity to consider EPA's contentions on a full factual record. For purposes of this motion, the Court will consider the allegations and facts in the light most favorable to the non-moving party—the EPA.[59]

Consequently, in order best to balance these competing concerns, the Court believes that a stay is in order which would (1) allow Cargill to complete construction of its pollution control facilities without fear of the imposition of conflicting remedies, (2) ensure that Cargill will pursue its voluntary construction plan in good faith and allow the EPA to seek appropriate injunctive relief if Cargill does not do so, and (3) allow the EPA to ensure that a penalty which is adequate to satisfy the concerns embodied in EPA's penalty policy be sought and assessed, if appropriate.

To this end, the Court will enter an Order staying this action on the following conditions: (1) Cargill shall submit to this Court and serve upon the EPA, within 60 days of the entry of the order staying this action, a revised schedule for the construction of the proposed additions to its wastewater treatment system. (2) After the submission of the revised construction schedule noted above, Cargill shall submit to this Court and the EPA every 60 days thereafter, progress reports which shall set forth the progress achieved in the preceding 60-day period with respect to the construction of the wastewater treatment system and, if the construction falls behind the revised schedule, Cargill shall report the reasons for the

delay. (3) If it should appear at anytime hereafter that Cargill is not, in good faith, expeditiously completing the construction of its wastewater treatment system, this Court, upon motion by the EPA, will consider the dissolution of the stay granted herein. (4) In any case, the stay shall dissolve no later than the date upon which the completion of the construction of the wastewater treatment system is projected in the revised construction schedule unless prior to that time good cause is shown for extending the stay. (5) Any discovery relating to the assessment of a civil penalty for past violations under the Clean Water Act may proceed during the stay. Finally, the Order will require Cargill to answer the complaint in this action no later than 20 days after the dissolution of the stay. In all other respects, Cargill's motion will be denied.

---

**59.** This Court, of course, will assess the penalty if EPA should ultimately prevail. This Court's judgment in determining whether a penalty would be appropriate and, if so, the amount, is by no means bound by the number generated by the EPA. The Court's discussion here should not be taken as an endorsement of the figure sought by the EPA. The Court has only addressed the interests which the parties seek to vindicate through litigation and has found that it should examine their positions and should not judge the ultimate merits on the meagre factual record before it. Indeed, were

it to rely solely on the factual record developed so far it would appear that Cargill, lacking any firm guidance in the form of § 301 effluent limitations and § 304 guidelines, has been shooting at a moving target, and has, in good faith, constructed each of the additions to its wastewater treatment facilities required by the DNREC or the EPA in a timely manner. Thus, if it were to rely solely on the record before it the Court would conclude that the fine sought by the EPA would not further the concerns underlying the EPA's penalty policy.