CONNECTICUT FUND FOR the ENVIRONMENT, INC., Natural Resources Defense Council, Inc.

v.

The UPJOHN COMPANY.

Civ. No. N–85–349 (PCD).

United States District Court, D. Connecticut.

May 18, 1987.

Katharine H. Robinson, Hartford, Conn., for Connecticut Fund.

James Thornton, New York City, for Natural Resources.

S. Robert Jelley, Wiggin & Dana, New Haven, Conn., Douglas E. Kliever, John M. Bredehoft, Clearly Gottlieb Steen & Hamilton, Washington, D.C., for defendant.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

DORSEY, District Judge.

### I. *Procedural History*

Plaintiffs, pursuant to 33 U.S.C. § 1365, seek a declaratory judgment that defendant, in violation of the Federal Water Pollution Control Act ("FWPCA"), has exceeded the pollution discharge limits ("limits") allowed by the National Pollutant Discharge Elimination System ("NDPES") Permit No. CT0001314 ("Permit"). Plaintiffs further seek (1) an injunction against future violations of the Permit; (2) an order that defendant provide plaintiffs with copies of all reports made of its discharge levels; (3) an order that defendant pay civil penalties of $10,000 for each day of each violation of the Permit, pursuant to 33 U.S.C. § 1319(d); and (4) award plaintiff costs, pursuant to 33 U.S.C. § 1365(d). This ruling will consider the parties' cross motions for summary judgment.

### II. *Facts*

Plaintiffs assert that their members' recreational, aesthetic and environmental interests are adversely affected by defendant's alleged discharge of pollutants beyond the limits set forth in the Permit.[1] Plaintiffs' standing is not in question. *See Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61 (2d Cir.1985) (person who finds water pollution offensive to his aesthetical values meets the standing requirements of *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636

---

1. Jurisdiction is not contested. *See* 33 U.S.C. § 1365(a).

(1972), and *Sierra Club v. SCM Corp.*, 747 F.2d 99 (2d Cir.1984); *Rite-Research Improves the Environment v. Costle*, 650 F.2d 1312, 1319 (5th Cir.1981)). Defendant, a corporation, manufactures organic chemicals in North Haven, Connecticut. It discharges approximately 570,000 gallons per day of treated wastewater into the Quinnipiac River. This discharge is subject to the Permit originally issued by the Connecticut Department of Environmental Protection ("DEP") on December 30, 1974, and amended on several occasions. The Permit limits defendant's discharge of pollutants.[2] Plaintiffs allege that between December 1981 and March 1986 [3] defendant exceeded the limits and thus violated FWPCA 1374 times.[4]

### III. *Discussion*

#### A. *Defendant's Motion for Summary Judgment*

Defendant has moved for summary judgment on the ground that plaintiffs lack authorization under 33 U.S.C. § 1365(b)(1)(B) to maintain this action. Alternatively, defendant argues for dismissal under the abstention articulated in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). Plaintiffs have moved for summary judgment on the ground that there is no genuine issue of material fact as to defendant's violation of the Permit on numerous occasions and that plaintiffs are entitled to both monetary and equitable relief.[5] Defendant's motion will be considered first.[6]

#### 1. *Prior State Proceeding*

Section 1365(b)(1)(B) provides:

No action may be commenced—

. . . . .

if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

On July 23, 1985, Stanley Pac, Commissioner of DEP, referring to defendant's February, March and April, 1985 alleged Permit violations, requested "that [the Attorney General] seek a forfeiture under section 22a–438 of the Connecticut General Statutes." Letter from Stanley Pac to Atty. Gen. Joseph Lieberman (July 23, 1985). A complaint was drafted and verified on August 2, 1985. *See* Complaint Cover Sheet in *Stanley Pac, Commissioner of DEP v. The Upjohn Co.*, CV 85–0308953 S, Superior Court, Judicial District of Hartford/New Britain at Hartford. That complaint was served on August 7, 1985, and filed in court on August 9, 1985. This action was filed on August 6, 1985.[7]

---

**2.** Defendant claims that the Permit's allowable quantities were guidelines, not limits. *See infra,* Section III–B–(3).

**3.** The five year statute of limitation is not in dispute. *See Connecticut Fund for the Environment v. Job Plating Co.*, 623 F.Supp. 207, 212–13 (D.Conn.1986).

**4.** Plaintiffs concede that as to 13 alleged violations they miscounted, *see infra,* Section III–B–(7), and that 50 of the alleged violations are the subject of the state action, *Pac v. The Upjohn Co.*, CV 85–308953 S, Superior Court, Judicial District of Hartford/New Britain at Hartford, and are not in issue here.

**5.** Plaintiffs' motion would not resolve the question of the relief to which plaintiffs would be entitled, a question resolvable on a further hearing. Plaintiffs' motion is thus for partial summary judgment.

**6.** Defendant's motion is considered first, as a ruling granting defendant's motion would render moot consideration of plaintiffs' motion.

**7.** Plaintiffs do not argue that the state has not "diligently" prosecuted the action. *See generally Hudson River Sloop Clearwater v. Consolidated Rail Corp.*, 591 F.Supp. 345, 350–52 (N.D.N.Y. 1984), *aff'd in part, rev'd on other grounds sub nom. Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57 (2d Cir.1985); *Student Public Interest Research Group of New Jersey v. Fritzsche, Dodge & Olcott*, 579 F.Supp. 1528, 1535–37 (D.N.J.1984), *aff'd on other grounds*, 759 F.2d 1131 (3rd Cir.1985); *Connecticut Fund for the Environment v. Contract Plating Co.*, 631 F.Supp. 1291, 1293 (D.Conn.1986); *Gardeski v. Colonial Sand & Stone Co.*, 501 F.Supp. 1159, 1163 (S.D.N.Y.1980).

The first question is: What is the meaning of "commence"? Defendant, arguing that FWPCA citizen suits were to be subordinate to governmental enforcement, urges that the state action be considered as having been commenced on July 23, 1985, the date Commissioner Pac requested initiation of a state suit. Plaintiffs, arguing that the DEP was given the requisite sixty-day notice to initiate its action, urge that commencement be found either at the time of service of process or upon the filing of the complaint.

■ The private enforcement provision of FWPCA was designed to serve a twofold purpose—first to act as a spark to ignite agency enforcement and second to act as an alternative enforcement mechanism absent agency enforcement. *Baughman v. Bradford Coal Co.*, 592 F.2d 215, 218 (3d Cir.1978) *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). Congress provided, however, that citizen suits should be subordinate to agency enforcement and devised restrictions to ensure that result. *Contract Plating Co.*, 631 F.Supp. at 1293 (under § 1365(b)(1)(B) a defendant would "not be subjected simultaneously to multiple suits, and potentially to conflicting court orders, to enforce the same statutory standards"). *See also, Friends of the Earth*, 768 F.2d at 63, quoting *Natural Resources Defense Council v. Train*, 510 F.2d 692, 700 (D.C.Cir.1975) ("[R]ecognizing the 'obvious danger that unlimited public actions might disrupt the implementation of the Act and overburden the courts,' Congress incorporated explicit restrictions on citizen suits" under § 1365.).

■ "It is a 'familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' " *Friends of the Earth*, 768 F.2d at 62, quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Here, the operable language is—"commenced ... a civil or criminal action in a court of the United States...." § 1365(b)(1)(B). Defendant is correct in noting that the common meaning of the word is "begin" or "initiate," but for purposes of this statute it must be interpreted as a term of art. Specifically, an action is "commenced" in federal court when a complaint is filed, Fed.R.Civ.P. 3; *Chesapeake Bay Foundation v. American Recovery Co.*, 769 F.2d 207, 208 (4th Cir.1985), and, in a Connecticut court when the complaint is served, *Valley Cable Vision, Inc. v. Public Utilities Comm'n*, 175 Conn. 30, 33, 392 A.2d 485 (1978). Here, the state complaint was served on August 7, 1985, and filed on August 9, 1985; the federal complaint was filed on August 6, 1985. Thus, under either federal or state interpretation of commencement, the federal suit was commenced first.[8] Congress did not use precise language in construing this section. Commencing a suit is variously stated: "may initiate a civil suit," "begins a civil action," "file an action," "act on the alleged violation."[9] Legislative History at 3745. Nevertheless, absent a clear contrary intention, these phrases must be read to be mere substitutes for the word "commence" and, therefore, embody the legal definition of how it is interpreted.

---

8. Although technically the court need not consider whether Congress intended to adopt the state rule for commencement as opposed to the federal rule, for purposes of national uniformity and given the reference to the word "filing" in the applicable legislative history, *see* text *supra*, the better approach is to adopt the federal meaning. *Cf. Cheng Fan Kwok v. INS*, 392 U.S. 206, 212, 88 S.Ct. 1970, 1974, 20 L.Ed.2d 1037 (1968) (In situation involving federal legislation where two different constructions are possible, credit should be given to the construction that effectuates the congressional purpose.).

9. This latter phrase, upon which defendant relies to justify its broad reading of the statute, provides:

> The time between notice and filing of the action should give the administrative enforcement office an opportunity to act on the alleged violation.

FWPCA, Amendments of 1972, Senate Rep. No. 92–414, *reprinted in* 2 U.S.Code Cong. & Adm. News, 3668, 3745 (1972) ("Legislative History").

The sixty day waiting period of § 1365(b)(1)(B) gives the government the opportunity to act and to control the course of the litigation if it acts within that time period. If the government delays, then the citizens may go forward with their own suit, unless before they file "the Administrator or State has commenced and is diligently prosecuting" its own enforcement action. § 1365(b)(1)(B). This latter statutory bar is an exception to the jurisdiction granted in subsection (a) of § 1365, and jurisdiction is normally determined as of the time of the filing of a complaint. Moreover, the verb tenses used in subsection (b)(1)(B) and the scheme of the statute demonstrate that the bar was not intended to apply unless the government files suit first (and is diligently prosecuting such suit).

*Chesapeake Bay Foundation,* 769 F.2d at 208 (construing three hour difference between citizen filing and government filing in federal court) (dicta). In short, absent a clear Congressional intention to the contrary, the statute does not allow consideration of acts in preparation for the filing of a complaint; rather, the court must apply an inflexible rule which determines jurisdiction from the time of filing the complaint. Accordingly, plaintiffs are not barred from bringing this suit under § 1365(b)(1)(B).

### 2. *Abstention*

Defendant also contends that this case should be dismissed based upon "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246, quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952). Defendant's argument is not supported by the law.

■ The burden placed upon one seeking a stay or dismissal of a federal court action in favor of a state action is a heavy one. *Landis v. North American Co.,* 299 U.S. 248, 255, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936); *United States v. Cargill, Inc.,* 508 F.Supp. 734, 748 (D.Del.1981). "[O]nly with the presence of exceptional circum-stances will the existence of concurrent state proceedings warrant the abdication of 'the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.'" *Cargill,* 508 F.Supp. at 748, quoting *Colorado River,* 424 U.S. at 817–18, 96 S.Ct. at 1246. Defendant, "therefore, must demonstrate either 'exceptional circumstances' or 'a clear case of hardship or inequity in being required to go forward' before a dismissal or stay may issue. *Id.,* quoting *Colorado River* at 817–19, 96 S.Ct. at 1246–47; *see also Gilbane Bldg. Co. v. Nemours Foundation,* 568 F.Supp. 1085, 1088 (D.Del.1983), quoting *Landis,* 299 U.S. at 255, 57 S.Ct. at 166; *Guenveur v. State Farm Mut. Automobile Ins. Co.,* 551 F.Supp. 1044, 1046 (D.Del.1982). Most of the courts which have considered absten-tion under FWPCA have not abstained.

■ *Colorado River* abstention requires a "careful balancing" of the several factors which have been cited as important in the determination of the propriety of such an order. *Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 14–16, 103 S.Ct. 927, 936–37, 74 L.Ed.2d 765 (1983). These factors include: (1) The inconvenience of the federal forum. *See Colorado River,* 424 U.S. at 818–20, 96 S.Ct. at 1247; (2) The desirability of avoiding piecemeal litigation. *See id.;* (3) The order in which jurisdiction was obtained by the concurrent forums. *See id.;* (4) The existence of a federal policy militating either in favor of or against such a stay. *Id.;* (5) The identity of interest (or parties) in the two forums or lack thereof. *See United States v. West Penn. Power Co.,* 460 F.Supp. 1305, 1316 (W.D.Pa.1978); (6) The existence of an important countervailing federal interest which federal courts might be more likely than state courts to respect or enforce. *See Bio-Analytical Serv., Inc. v. Edgewater Hospital,* 565 F.Supp. 450, 454 (7th Cir. 1977) *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978); (7) Whether federal law or state law provides the rule of decision. *See Cone,* 460 U.S. at 23–26, 103 S.Ct. at 941–942; and, (8) Whether the state court is adequate to protect the interests of the parties. *See id.,* at 26–27, 103

S.Ct. at 941–42. *See also generally United States v. SCM Corp.*, 615 F.Supp. 411, 416–20 (D.Md.1985); *Brewer v. City of Bristol*, 577 F.Supp. 519, 524–29 (E.D.Tenn. 1983); *Cargill*, 508 F.Supp. at 747–51. Applying these factors to this case yields the conclusion that abstention is not warranted.

(a) *Inconvenience of the Federal Forum*

Although the inconvenience of the federal forum was noted as an important factor in *Colorado River*, 424 U.S. at 819, 96 S.Ct. at 1247, where the district court was more than three hundred miles away from the more convenient state proceeding site, that factor is inconsequential where, as here, the state and federal courts are less than two miles apart.

(b) *Avoiding Piecemeal Litigation*

█ The avoidance of piecemeal litigation to avoid inconsistent rulings is perhaps the most important factor in the abstention analysis. *Cone*, 460 U.S. at 16, 103 S.Ct. at 937; *Colorado River*, 424 U.S. at 819, 96 S.Ct. at 1247. This factor requires a comparison of the nature of the action in the state court with the nature of the action in the federal court. Plaintiffs seek both to enjoin defendant from further pollution beyond the limits in the Permit and damages for defendant's alleged violations of these limits since 1981. In the state action, the DEP seeks similar equitable and legal relief for defendant's alleged violations during the months of February, March, and April of 1985. Defendant's liability for the violations alleged in the state court was preliminarily determined by State Referee Robert Whitman's finding that Upjohn discharged pollutants in excess of its Permit during the three months alleged in the state complaint. *Stanley J. Pac*, Preliminary Decision of Referee at 4–10 (December 19, 1986). The appropriate remedy has not been decided. Thus, for all practical purposes, the state action is almost complete.[10] This is particularly important in

view of the court's holding *infra* as to defendant's liability in this case. *See infra*, Section III–(b), *et seq.* Accordingly, the possibility of inconsistent rulings on the liability question is unlikely. Furthermore, any remedy from either court can be tailored to the relief afforded by the parallel court. *SCM Corp.*, 615 F.Supp. at 419, citing *United States v. Hartford Sands, Inc.*, 575 F.Supp. 733, 735 (D.Md.1983); *cf. Brewer*, 577 F.Supp. at 526 ("While it is possible that the federal court might impose greater sanctions on the defendant that those imposed by the state court or impose a heavier penalty, [or vice versa], in all probability those sanctions would be cumulative rather than conflicting."). The propriety of allowing dual proceedings is further compelled by FWPCA itself. Section 1365 specifically recognizes the possibility of and, in fact, authorizes concurrent proceedings. *Brewer*, 577 F.Supp. 526; *Cargill*, 508 F.Supp. at 741.

(c) *Order of Jurisdiction*

█ While the order in which courts received jurisdiction should be considered in determining abstention, the relative progress in the two actions, rather than the mere filing date, should be the paramount consideration. *Cone*, 460 U.S. at 21–22, 103 S.Ct. at 939–40. Although the state action is almost completed, the issues in this case are more extensive than those in the state action. Furthermore, plaintiffs, although generally aware of the history of defendant's Permit, probably do not have the same knowledge of the course of conduct between the DEP and defendant as did plaintiffs in the state action. Thus, when considering the relative complexity of the cases and the status of the respective plaintiffs, the completion of the state suit on the issue of liability should not be controlling.

(d) Federal Policy Militating in Favor or Against Abstention

Defendant argues that a strong federal policy favors allowing the states the right

---

**10.** "[T]he *Colorado River* doctrine is only implicated in 'situations involving the contemporaneous exercise of concurrent jurisdiction,' by state and federal courts." *SCM Corp.*, 615 F.Supp. at

418, quoting *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246. The conclusion of the parallel proceeding eliminates any need to discuss abstention. *SCM Corp.*, 615 F.Supp. at 418.

to ensure enforcement of the NDPES program. Defendant's Memorandum at 29, citing *Cargill,* 508 F.Supp. at 749 and 33 U.S.C. § 1251. "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution...." § 1251(b). This section must be read, however, in conjunction with § 1365 which authorizes citizen enforcement not only as a means to prompt state action, but also as a supplement to such action. Indeed, the "diligent prosecution" standard, § 1365(b)(1)(B), was intended to ensure both real and effective enforcement by the state. Legislative History at 3746. Thus, the federal policy of ridding the nation's waters of pollution, § 1251(a)(b) and (c), does not militate against this suit, but in fact supports this court's retention of jurisdiction.[11]

### (e) *Identity of Interests of Parties*

The interests being pursued by plaintiffs in both suits are identical in the sense they are seeking the same equitable relief and similar legal remedies. However, the suits are dissimilar in the number of violations alleged; the number of effluents involved in each complaint (five in the state action and upwards of twenty-seven in the federal action); the dates of the violations; and the identity of the plaintiffs.[12] While the differences between the two suits might not be critical in assessing the adequacy of the state court action, for purpose of determining the diligence of the state prosecution, *Contract Plating Co.,* 631 F.Supp. at 1293, such differences are sufficient to dictate against abstention of the basis of similarity of issues.

### (f) *Respect for Federal Interest*

■ The control of pollution is neither exclusively a state nor federal concern. Rather, it is a policy which transcends government borders and would be vindicated in either proceeding. Thus, in this field, the federal and state interests are in reality the same and lend little to the abstention decision. *Cf. Edgewater Hospital,* 565 F.2d at 454 (federal court's refusal to grant abstention in view of the strong federal interest in respecting arbitration agreements and the refusal by the parallel state court to respect that agreement in its action).

### (g) *Rule of Decision*

■ The abstention analysis also requires that some deference be made to the court of the government whose law is to be applied. *Cone,* 460 U.S. at 23–26, 103 S.Ct. at 941–42. In *Cone,* deference to the federal court was deemed appropriate, partly because the suit involved arbitration—long a matter of federal interest and substantial federal judicial concern. Here, the FWPCA is clearly an assimilation of both state and federal law. While the NDPES permits are drawn by the state, they must meet the standards in 33 U.S.C. § 1342 and are subject to the approval of the Administrator of the Environmental Protection Administration, 33 U.S.C. § 1342(d)(2). Water pollution is quite simply a matter of both federal and state interest and regulation.

### (h) *Adequacy of State Proceedings*

The ability of the state court to address the issues presented in the concurrent suits must also be considered. *Cone,* 460 U.S. at 26–27, 103 S.Ct. at 942–43. The capability of the state court to address the issues presented is not seriously in doubt.

■ Therefore, on balance, and particularly in view of the strong federal policy favoring retention of jurisdiction, abstention from the exercise of jurisdiction by this court is not justified. None of the factors considered tilt the scale toward abstention. Potential conflicts in deciding the

---

**11.** Defendant's argument that concurrent actions yield a disincentive to entities like defendant to cooperate with state authorities, Defendant's Memorandum at 30, lacks merit. Congress did not intend that concurrent citizen suits be dismissed merely to produce cooperation; it would seem that the threat of factory closings and stiff penalties would more likely serve that goal.

**12.** The dissimilarity of plaintiffs is not particularly significant, since plaintiffs here could have intervened in the state action.

appropriate relief can be avoided by carefully tailoring the relief granted here to conform to and supplement the relief awarded in the state suit or *vice versa.* Accordingly, defendant's motion for summary judgment is denied.[13]

B. *Plaintiff's Motion for Summary Judgment*

1. *Statutory History and Relevant Background Facts*

The objective of the FWPCA, enacted in 1948, Act of June 30, 1948, 62 Stat. 1155, as substantially amended on October 18, 1972, by Pub.Law No. 92–500, 86 Stat. 816, was to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to eliminate "the discharge of pollutants into the navigable waters ... by 1985." 33 U.S.C. § 1251(a). NDPES permits were established as "a means of achieving and enforcing the effluent limitations.... An NDPES permit serves to transform generally applicable effluent limitations and other standards— including those based on water quality— into the obligations (including a timetable for compliance) of the individual discharger...." [14] *EPA v. State Water Resource Control Board,* 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976); *see also generally American Petroleum Inst. v. EPA,* 787 F.2d 965, 969 (5th Cir.1986). Sections 1311 and 1342 are the primary provisions that describe the effluent system. Section 1311(b)(1)(A) directs the Administrator by not later than July 1, 1977, to establish effluent limitations requiring "the application of the best practicable control technology currently available ('BCT')."

Section 1311(b)(2)(E) requires, by not later than July 1, 1984, the establishment of effluent limitations for conventional pollutants requiring "application of the best conventional pollutant control technology ('BCT')." Section 1311(b)(2)(A) & (F), elevating the BCT standard even further, requires the dischargers to have begun applying 'the best available technology economically achievable' ('BAT') to listed toxic pollutants, by July 1, 1984, and to all other pollutants, by July 1, 1987." [15] *American Petroleum,* 787 F.2d at 970 (footnote omitted). Generally, a violation of the limits set forth in the NDPES permits constitutes a violation of FWPCA.[16] 33 U.S.C. 1311(a). *See also* Conn. Agencies Regs. 22a–430–3(e).

The FWPCA also provides for the administration of the NDPES program by the states, subject to approval by the Administrator of the Environmental Protection Agency. 33 U.S.C. §§ 1342(a)(5) and 1342(b). Connecticut's program, *see* Conn. Gen.Stat. § 22a–416, *et seq.,* "was approved and authorized by the Administrator on September 26, 1973." *Mianus River Preservation Committee v. EPA,* 541 F.2d 899, 901 (2d Cir.1976). The Permit in question here was first issued on December 30, 1974, and required the installation of a BCT system. Testimony of Richard Mason, Principal Sanitary Engineer, DEP, Permit Hearing December 18, 1979 at 18–19. Through the years, defendant was requested to improve that system in order to be able to implement the more stringent BAT when such came to be required. Thus, the Permit Order of November 1981 required the proposal of "modifications and/or additional facilities which would maximize the

**13.** Defendant's reliance on *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 316, 102 S.Ct. 1798, 1805, 72 L.Ed.2d 91 (1982), is misplaced. *Weinberger* does not stand for the proposition that a court should ignore the jurisdictional provisions of the FWPCA and defer determination of cases arising under the Act to state courts.

**14.** "[E]ffluent limitation" means any restriction established by a State or the Administration on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of

the contiguous zone, or the ocean, including schedules of compliance.
33 U.S.C. § 1362(11). *See also* Conn. Agencies Regs. 22a–430–3(a)(3).

**15.** Conventional pollutants are described at § 1314(a)(4) and listed at 40 C.F.R. § 401.16. Toxic pollutants are described in § 1317(a)(1) and listed at 40 C.F.R. § 401.15.

**16.** The NDPES permits also specify monitoring and reporting obligations. 33 U.S.C. § 1318, 40 C.F.R. § 122.41. *See also* Conn. Agencies Regs. 22–430–3(j).

efficiency and operational reliability of the wastewater treatment facilities and in-plant recovery system and provide ... [BAT]." Permit Order November 9, 1981 at 6. Defendant's effluent limitations for the period November 1981 to December 1982 were set out in that order,[17] *id.* at 2, but were subject to modification after February 28, 1982, if authorized by the DEP, *id.* at 3, or at any time if the EPA established applicable effluent guidelines for defendant's industry, pursuant to §§ 1311(b)(2)(C) & (D), 1314(b)(2), and 1317(a)(2).[18] On October 7, 1982, the Permit was again modified to tighten the effluent limitations for the period from November 1982 to April 1983 and to expand and reaffirm the reporting and modification requirements in anticipation of and preparation for defendant's installation of the BAT system. Permit Order October 7, 1982 at 6; *see also* Testimony of Richard Mason, Permit Hearing July 8, 1982 at 7–8, 11.[19] It was further stated by Mason at the permit hearing, that the next modification would be made by December 31, 1982, at which time the DEP would place "BAT limitations in the permit as a goal to achieve when the chosen treatment technology has been constructed." *Id.* at 11. That modification was actually issued on March 10, 1983.

The March 10, 1983 order required the complete implementation of BAT wastewater treatment facilities by November 30, 1983. Permit Order March 10, 1983 at 4, 8, 9. It further provided that effluent quality from the BAT facilities would be evaluated for one year "beginning on December 1, 1983 after which time revised effluent limi-

tations [would] be adopted, if necessary to reflect the actual ability of the treatment facilities to remove the permitted pollutants." *Id.* at 4. That order also established effluent limitations for the period preceding November 30, 1983—the proposed date for BAT implementation—and the period after November 1, 1983.

In late 1984 and 1985 defendant met with DEP officials to discuss the BAT system and the results obtained. Testimony of Robert Campaigne, Director of Manufacturing, Research and Development, and Analytic Chemistry, Upjohn, *Pac* July 30, 1986 Transcript at 38–39, 42 & 47. Defendant expressed concern to DEP that it could not achieve the March 1983 limits; DEP was unwilling to modify the order, even though it recognized defendant's apparent inability to satisfy the designated limits. Instead, DEP maintained the limits after concluding that defendant's discharges were highly toxic and that making the numbers less stringent would increase the discharge toxicity. Testimony of Richard Mason, *Pac* July 29, 1986 Transcript at 24–27. Indeed, defendant was asked to continue to modify its system in order to achieve better results. Testimony of Robert Campaigne, *Pac* August 6, 1986 Transcript at 11. Subsequent modifications appear to have achieved similar results. *Id.* at 52. In September 1985, defendant modified its manufacturing system to include a hydrogenation process. That modification significantly affected several of the pollutants discharged. Nonetheless, defendant still claims it is unable to comply completely with the limitations.

---

**17.** Defendant argues that the numbers in the order were goals, not limitations. *See, infra,* Section III–B–(3).

**18.** The EPA has not been energetic in promulgating effluent guidelines for organic chemical manufacturers. *See* proposed guidelines, 48 Fed.Reg. 11828 (Mar. 21, 1983); 50 Fed.Reg. 29068 (July 17, 1985); 50 Fed.Reg. 41528 (Oct. 11, 1985).

**19.** Defendant's claim that no limits were in effect between November 10, 1981, and October 7, 1982, and between December 1, 1982, and March 31, 1983, is contrary to the facts. The November 1981 order listed effluent limitations for 18 parameters for the period prior to Febru-

ary 28, 1982. That order also provides that for the period February 28, 1982, to July 31, 1983, the average flow would remain the same. It is implicit in that statement that the effluent limitation would likewise remain the same. This was apparently recognized by defendant, since the November 1981 order contains a handwritten note that the limitations would apply until October 1982. The same rationale applies to the October 7, 1982 order, which regulates the period December 1982 to April 1983. Permit at 2 and n.\*. Furthermore, since the Permit was considered as issued pursuant to § 1342, defendant was bound to comply with the Permit until it was modified. 40 C.F.R. § 122.41(f).

### 2. *Procedural Framework*

Plaintiffs have now moved for summary judgment on the issue of defendant's liability. They argue that defendant's conduct should be measured by a strict liability standard and that comparison of defendant's discharge monitoring reports ("DMRs") with the Permit limitations unquestionably demonstrates the fact and the number of violations. Defendant does not dispute the strict liability standard, but argues that the Permit established only goals and not enforceable effluent limitations. Defendant thus claims that it cannot be held to have violated what the Permit established as goals and not limits.

### 3. *Strict Liability*

Under the FWPCA, compliance is a matter of strict liability and a defendant's intention to comply or good faith attempt to do so does not excuse a violation. *United States v. Earth Sciences*, 599 F.2d 368, 374 (10th Cir.1979); *Job Plating Co.*, 623 F.Supp. at 218; *Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 451–53 (D.Md.1985); *Student Public Interest Research Group v. Tenneco Polymers, Inc.*, 602 F.Supp. 1394, 1399 (D.N.J. 1985); *United States v. Amoco Oil Co.*, 580 F.Supp. 1042, 1050 (W.D.Mo.1984). Indeed, that rule is supported by the legislative history of FWPCA: "[t]he bill ... establishes and makes precise new requirements imposed on persons and subject to enforcement. One purpose of these new requirements is to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements under the FWPCA should be based on relatively narrow fact situations requiring a minimum of discretionary decision making

or delay." Legislative History at 3730. Elsewhere the legislative history states: "[t]he factual basis for enforcement of requirements would be available at the time enforcement is sought, and the issue before the court would be a factual one of whether there had been compliance." *Id.*, at 3746. Thus, the fact-finding process for determining compliance is a simple one—it involves comparing the reported discharges to the applicable effluent limitations to determine in which instances the discharges exceeded the allowable limits.

Defendant argues that the history of its Permit reveals that defendant was not confronted with actual limitations with which it was bound to comply, but merely with goals which it was requested to try and achieve. The record indicates a generally amicable relationship between defendant and the DEP and that both cooperated in the effort to bring defendant's pollutant discharges into compliance with the law through modifications of defendant's waste water treatment process. Thus, at the January 1983 hearing, Mason indicated that the modifications to the effluent limitations in the March 1983 order were subject to change based on the performance of the new system.[20] Statement of Richard Mason, Permit Hearing January 17, 1983 at 7–8. This comment was incorporated into the March 1983 order. Permit Order, March 10, 1983 at 4. DEP official Barlow echoed these same remarks. Statement of Richard Barlow, Permit Hearing March 4, 1983 at 10.

In support of its argument, defendant relies on Conn.Gen.Stat. §§ 22a–430 and –431. It argues that the Permit was modified pursuant to § 22a–431, *see* Permit Order March 10, 1983 at 1, and that that section specifically authorizes DEP to or-

---

**20.** Mason, as far back as 1982, referred to the BAT effluent to be included in the 1983 order modifications as goals. Permit Hearing July 8, 1982 at 11. Interdepartmental Message from Richard Mason to William McKee, July 21, 1982. There is also some slight support for defendant's contention that the number contained in the 1981 and 1982 orders were also considered to be goals. *See also* Statement of unidentified DEP official (apparently Richard Arlow), Permit Hearing October 7, 1980 at 371,

389 ("these information limits were precisely that, they were for more information than enforcement control"). Nevertheless, the focus of defendant's argument centers primarily on the number contained in the 1983 order for the periods occurring after November 30, 1983—the date the BAT system was designed to be implemented. This ruling will likewise focus on the 1983 numbers. However, the analysis is equally applicable to the numbers contained in the 1981 and 1982 orders.

der a polluter to stop unlawful pollution discharge and in such an order set a "time schedule for the accomplishment" of such abatement. The DEP may then issue a permit regulating that polluter's further discharge. *See* § 22a–430(e). Defendant claims that the March 10, 1983 order should be considered an abatement order with the specified permit limitations being tied to the time schedule set out in the order. It argues further that such a finding is compelled by the order which states: "Upon verification of full compliance with this order modification, a letter acknowledging this order to be the equivalent of a permit issued under section 25–54i [§ 22a–430] and/or a revised NDPES permit will be issued." Permit Order March 10, 1983 at 11.

■ When all the circumstances are considered and the applicable statutes studied in their entirety, defendant's argument fails. Reduced to its basics, defendant is arguing that, as long as the DEP issues its orders pursuant to § 22a–431, the numbers imposed can never be considered effluent limitations and it can never be found to be in violation of § 22a–431. If sustained, defendant's argument would nullify any effective enforcement of DEP's orders. The NDPES orders issued pursuant to § 22a–431 were modifications to defendant's previously issued Permit. That Permit, issued under § 22a–430, was subject to § 22a–431, *viz* subject to periodic investigation by DEP as to whether the discharge therein limited would cause or threaten pollution to the waters of Connecticut and, if so, to an order of abatement. *See* §§ 22a–430(c), 22a–431. Section 22a–431 specifically states that "[s]uch order shall include a time schedule for the accomplishment of the *necessary steps leading to the abatement of the pollution*." (Emphasis added). One of those steps is the specification of effluent limitations. In the March 1983 order, the DEP established such effluent limitations and labeled them as such. Permit Order March 10, 1983 at 2; *see also* Permit, Findings of Fact accompanying March 10, 1983 Order, at 1. The order states: "[Defendant shall] [i]nsure that all discharges described in this Order shall not

exceed and shall otherwise conform to the specific terms and general conditions specified herein." Permit Order March 10, 1983 at 1. The order designates the quantities and concentration levels for each parameter. This language mirrors the definition of effluent limitation set out at § 1362(11) ("restriction established by a state ... on quantities, rates and concentration of [parameters]"); *see also*, 40 C.F.R. § 122.2 (1986); footnote 13, *supra.* Defendant's obligation to comply with those limitations rather than treat them as goals is further made apparent by the "General Conditions" which accompanied all the orders. Permit General Conditions at 1, ¶ 5 states: "The discharge of ... substances in excess of the terms and conditions of any existing permit shall constitute a violation of the terms and conditions of the permit...." Moreover, the order itself specifically states that it "shall be considered as the permit required by section 402 of the [FWPCA]." Permit Order March 10, 1983 at 11. In short, as is clear from the order and the statutes pursuant to which it was issued, the terms of the order did indeed constitute effluent limitations and not merely goals.

■ Furthermore, the nature of the Permit and the relationship of the state NDPES program to the FWPCA supports the conclusion that the March 1983 order set forth effluent limitations. Where the EPA has not adopted general effluent limitations for an industry like defendant's, the state is left to draft appropriate limitations based on its best professional judgment. The March 1983 order specifically provided that in the best professional judgment of the DEP the treatment facilities to be constructed by defendant would be considered a BAT system. Permit Order March 10, 1983 at 4. The limitations contained in that Permit became defendant's obligations. *California ex rel.*, 426 U.S. at 205, 96 S.Ct. at 2022. The DEP's modification of the Permit via the various orders is consistent with the FWPCA's purpose—to eliminate pollutant discharges by 1985 by a series of "progressively stricter standards." *Committee for Jones Falls Sewer System v.*

*Train,* 539 F.2d 1006, 1008 (4th Cir.1976) (defendant was required to comply with the permit and all its conditions, including meeting the discharge limitations). 33 U.S.C. § 1311; 40 C.F.R. 122.41.[21]

#### 4. Reliance on Agency Representations

Defendant also argues that it should not be held to have violated the FWPCA because it relied on the DEP's representations that the Permit numbers were goals, citing *United States v. Pennsylvania Indus. Chemical Corp.,* 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). In that criminal action, the government claimed that defendant's discharge violated Section 13 of the Rivers and Harbor Act of 1899. Defendant claimed that it relied on the Army Corps of Engineers' interpretation that the Rivers and Harbor Act only prohibited pollution which would *interfere* with the *navigable* waters. Defendant was held entitled to look to " 'the ruling, interpretation, and opinions of the [responsible agency] ... for guidance.' " *Id.,* at 674, 93 S.Ct. at 1816, quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

*Pennsylvania Indus.* must be read in light of the Supreme Court's most recent pronouncement on the issue of equitably estopping the government from acting by reason of the representations of its agents.[22] In *Heckler v. Community Health Serv.,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), the Court noted that:

"[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." [23] Arguably, even greater reluctance should be exercised in allowing an estoppel defense in the FWPCA area as such contradicts the general notion of strict liability. Nevertheless, here, as in *Community Health Serv.,* the question of whether an estoppel defense should ever be applied against the government generally or in FWPCA litigation particularly need not be resolved as defendant has failed to satisfy the elements of this defense.

A "party claiming estoppel must have relied on its adversary's conduct 'in such a manner as to change his position for the worse,' and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Community Health Serv.,* 467 U.S. at 59, 104 S.Ct. at 2223, quoting 3 J. Pomeroy, Equity Jurisprudence at 192, ¶ 805 (S. Symons ed. 1941).[24] Here, the question is whether defendant's reliance was reasonable. The DEP was responsible for implementing the FWPCA and ensuring that the discharge of pollutants into the nation's waters was curtailed. For that purpose, it worked with defendant to create a BAT water treatment system and imposed effluent limitations on defendant's discharges. It is clear that

---

**21.** Furthermore, even if defendant was entitled to a modification of its effluent limitation to reflect its BAT system results, 40 C.F.R. § 122.-62(a)(17), it remained liable during the pendency of any such request to comply with the Permit conditions until modified. 40 C.F.R. § 122.-41(f); 40 C.F.R. § 124.16(c)(1); *Student Public Interest Research Group v. Monsanto Co.,* 600 F.Supp. 1474, 1480 (D.N.J.1985).

**22.** Plaintiffs in this citizen suit stand in the shoes of the government with respect to this matter. *Chesapeake Bay Foundation v. Gwaltney of Smithfield,* 791 F.2d 304, 312 (4th Cir. 1986); *Student Public Interest Research Group v. P.D. Oil & Chemical,* 627 F.Supp. 1074, 1085 (D.N.J.1986); *Bethlehem Steel Corp.,* 608 F.Supp. at 448.

**23.** Defendant has argued that it is not claiming equitable estoppel but reliance. Although the two doctrines are distinct, the distinction need not be addressed, as either the Court has considered them as one doctrine or it was discussing estoppel in *Pennsylvania Indust.* and not strictly reliance. *Community Health Serv.,* 467 U.S. at 60 and n. 12, 104 S.Ct. at 2224 and n. 12. Furthermore, both doctrines involve reliance and thus the analysis is the same in each instance.

**24.** In *Pac,* Upjohn Vice-President Donald Griffith testified that defendant would have pursued a legal challenge to the March 1983 permit numbers had DEP officials not represented that they were goals. Testimony of Donald Griffith, July 30, 1986 Transcript at 14.

DEP had the authority and responsibility to impose such effluent limitations and to ensure that defendant so complied. As noted *supra,* the March 1983 modification order specifically refers to the numbers contained therein as effluent limitations. The order was stated to be a NDPES permit for FWPCA purposes and defendant was expected to know the effect of the limits contained in that permit and could not reasonably rely on the conduct of the state agents to the contrary. *Community Health Serv.,* 467 U.S. at 63 & n. 17, 104 S.Ct. at 2225 & n. 17, citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *cf. Kitlutsisti v. Arco Alaska, Inc.,* 592 F.Supp. 832, 839 (D. Alaska 1984) (reliance on EPA letter that it would not sue did not insulate defendant from citizen suit); *United States v. Anderson,* 637 F.Supp. 1106, 1109 (D.Conn. 1986) (taxpayer charged with knowledge of tax laws and statements in IRS instruction booklet do not support equitable estoppel argument); *Doe v. Civiletti,* 635 F.2d 88, 95–97 (2d Cir.1980) (statements made by DEA agents could not support estoppel argument). Noncompliance with an effluent limitation is a violation of the law. *Menzel v. County Utilities Corp.,* 712 F.2d 91, 94 (4th Cir.1983). Defendant could not reasonably have relied on statements to the contrary.

■ The reasonableness of defendant's reliance is further called into question by the fact that it did not challenge the March 1983 order. Defendant claims reliance on the DEP's representations that the numbers were goals; but that claim flies in the face of the fact that the order refers to them as effluent limitations. Indeed, the State Referee apparently so held in *Pac,* Preliminary Decision at 9, citing the Commissioner's Reply Memorandum at 9 ("whatever label the numbers agreed to prior to the issuance of the federal NDPES permit, once those members [sic] were placed in that permit and were called ef-

fluent limitations, they became legally enforceable as such").[25] Furthermore, defendant's objections to the limitations should have been raised when the orders were issued. Having failed to do so then, it is precluded from doing so now. *Job Plating Co.,* 623 F.Supp. at 216 (failure to commence administrative challenge to NDPES permit precluded defendant from doing so in this action); *Monsanto,* 600 F.Supp. at 1486 ("the regulations promulgated pursuant to the Act (*see* 40 C.F.R. 124.16) estop the defendant from claiming reliance on the agency's conduct and from claiming that its permit obligations were uncertain.).

■ Nevertheless, although defendant cannot preclude liability based on its reliance argument, the argument is relevant to the issue of damages. No person should be unfairly penalized for conduct when it reasonably relied on the apparently "good word" of the government. *Cf. Community Health Serv.,* 467 U.S. at 61, 104 S.Ct. 2224–25; *Doe,* 635 F.2d at 97. Defendant's failure to challenge the March 1983 order, and perhaps the 1981 and 1982 orders, though legally unreasonable, may have subjectively been a continuation of the cooperative atmosphere created with and by the DEP. That factor is appropriately to be considered on the issue of damages. *Monsanto,* 600 F.Supp. at 1486; *Amoco Oil,* 580 F.Supp. at 1050.

### 5. Obligation to Write a New Permit

■ Defendant next argues that the DEP was obligated to issue a NDPES permit which conformed to the results achieved under the BAT system pursuant to the the Permit which provided that after the BAT system had been reviewed for one year "revised effluent limitations [would] be adopted, if necessary, to reflect the the actual ability of the treatment facilities to remove the permitted pollutants." Permit Order March 10, 1983 at 4. Defendant's

---

**25.** Congress seems to have anticipated this situation.

A definition of effluent limitations has been included so that control requirements are not met by narrative statements of obligation, but rather are specific requirements of specificity as to the quantities, rates, and concentrations of physical, chemical, biological and other constituents discharged from point sources. Legislative History at 3743.

argument is unsound. First, the order expressly provided that notwithstanding the results derived from the BAT system, "[t]he Commissioner specifically reserves the rights to establish more stringent effluent limitations pursuant to Chapter 474a of the Connecticut General Statutes and the Federal Water Pollution Control Act should it be determined that these limitations will not protect the water quality of the receiving waters." DEP Official Mason testified in *Pac,* July 29, 1986 Transcript at 25–27, that in fact the DEP did not change defendant's effluent limitations because defendant's effluent proved to be highly toxic in testing done by the EPA. Relying on its authority to impose more stringent limitations than those required by the FWPCA, the DEP refused to change the limits pending further discovery. The order did not mandate modification of the effluent limits to the results achieved; rather, such was left to the discretion of the DEP depending on the actual results achieved by the BAT system. In any event, DEP retained its right to impose stricter standards than those mandated by the FWPCA. *Mianus River,* 541 F.2d at 906; *P.D. Oil Chemical,* 627 F.Supp. at 1089. Indeed, it also remained obliged to carry out its charge under the law, an obligation which carried with it the authority to impose stricter discharge standards.

Defendant's argument also fails for procedural reasons. Defendant argues that DEP's refusal to revise the effluent limitations based on the EPA toxicity test was wrong since toxicity cannot be determined from one test. Whether that is so is irrelevant. Defendant was obligated to comply with the Permit. 40 C.F.R. § 122.-41(f). Its failure provided grounds for enforcement. It may also have been the basis for a request for modification of the Permit, but, while such a request was pending, subsection (f) clearly obliged defendant to comply with the Permit. *Menzel,* 712 F.2d at 94; *Monsanto Co.,* 600 F.Supp. at 1479, 1483. *See also Train v. Natural Resources Defense Counsel,* 421 U.S. 60, 92, 95 S.Ct. 1470, 1488, 43 L.Ed.2d 731 (1975) (under Clean Air Act requests for permit variances are "carried out on the

polluter's time, not the public's, for during its pendency the original regulations remain in effect, and the polluter's failure to comply may subject him to a variety of enforcement procedures").

Finally, defendant's argument is defective for the reasons noted *supra* in relation to the reliance argument. Congress recognized that the EPA and/or state environmental protection agencies were best suited to determine pollution regulations. Accordingly, legal enforcement was envisioned simply to be a matter of comparing the DMRs and the applicable authorized effluent limitations to determine compliance. Legislative History at 3746. Defendant could have pursued objections to the Permit either through an administrative challenge pursuant to Conn.Gen.Stat. §§ 22a–436 & –437 or by filing for review in the Court of Appeals. It may not seek modification of a permits after the fact in defense to an enforcement action. *Job Plating Co.,* 623 F.Supp. at 216–17.

### 6. *Laches*

Defendant next claims that the equitable doctrine of laches bars this suit. The argument lacks merit. The basic principle underlying the doctrine of laches is a simple one—"equitable remedies are not available if granting the remedy would be inequitable to the defendant because of the plaintiff's long delay [in bringing suit]." *Environmental Defense Fund v. Alexander,* 614 F.2d 474, 478 (5th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). The doctrine requires proof that (1) plaintiff inequitably delayed in raising his claim (2) without an excuse (3) and that the defendant suffered undue prejudice as a result of the delay. *Id.* Although the doctrine has been recognized as potentially applicable in the environmental law area, *Lloyd A. Fry Roofing Co. v. EPA,* 554 F.2d 885, 891 & n. 4 (8th Cir. 1977); *Sierra Club v. Alexander,* 484 F.Supp. 455, 471 (N.D.N.Y.), *aff'd,* 633 F.2d 206 (2d Cir.1980), no court has reported reliance on it to bar an enforcement action. Indeed, even *Fry Roofing,* 554 F.2d at 891 n. 4, can be read to suggest that the doc-

trine is only relevant to the issue of damages. The seemingly unwillingness to apply the rule in this area is twofold: "(1) the magnitude and importance of the rights at stake when the interest of the public is asserted; and (2) the determination that those rights cannot be be compromised or forfeited by the negligent or illegal acts of those who act not for themselves but only a guardians of the public." *P.D. Oil & Chemical*, 627 F.Supp. at 1085, citing *United States v. California*, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 1668–69, 91 L.Ed. 1889 (1947); *see also, Steubing v. Brinegar*, 511 F.2d 489, 494–95 (2d Cir.1975). Although *P.D. Oil & Chemical*, apparently adopted a flat rule prohibiting the defense of laches in these types of actions, the better rule would be to allow the defense in limited circumstances when it is factually warranted.[26] *See Alexander*, 484 F.Supp. at 476. Here, defendant has not satisfied the requisite elements of the doctrine.

■ Defendant argues that plaintiffs have monitored and been involved in each of the hearings on defendant's Permit and thus could have brought the action long before now. Plaintiff, on the other hand, argues that its involvement was a good faith effort to work with defendant and the DEP to accomplish the goals of the FWPCA. Defendant has not produced any evidence to refute this point. To invoke an estoppel, defendant must prove that plaintiffs inexcusably and inequitably delayed the filing of this action. That it has not done. Rather, the record suggests that plaintiffs monitored the Permit hearings in the watchdog capacity that Congress contemplated. Consistent with that policy, suit was commenced when defendant's efforts to control its pollution discharge seemed to be less sincere than they might have been.[27] Plaintiffs may properly allege violations dating back to 1981, *Job Plating Co.*, 623 F.Supp. at 212–13, to seek civil penalties for those violations, 33 U.S.C. § 1365 and 1319(d), and an equitable order of compliance. *Job Plating Co.*, 623 F.Supp. at 213–14.

Furthermore, defendant has also failed to show that it has been prejudiced by plaintiffs' filing when they did. Defendant argues that had plaintiffs instituted this action earlier it would have challenged each order and requested a clarification as to the nature of numbers contained in that order. It further claims that it would not have invested substantial capital into the 1984 BAT experiments if it felt the numbers were effluent limitations and not goals. As noted *supra*, those numbers were specified in the Permits as effluent limitations and defendant was in error both factually and arguably from a legal standpoint in relying on any other construction of those numbers. Any objection to those numbers should have been raised when the orders were issued. Defendant has raised no question of material fact which suggests that plaintiffs acquiesced in defendant's construction of the Permit as merely setting forth goals, which defendant could fail to meet with impunity rather than enforceable limitations. Defendant drew its own

26. *P.D. Oil & Chemical*, 627 F.Supp. at 1085, particularly relied on the rationale that private citizens acted as "private attorney generals" and thus "should not have fewer rights to enforce the statute than the government." As noted, the court does not adopt a flat rule prohibiting the defense of laches under the FWPCA and to the extent *P.D. Oil & Chemical* stands for that proposition it is rejected. Instead, the rule should be subject to proof of the underlying elements and the heavy burden in favor of effectuating the public policy interest embodied in the FWPCA via adherence to the twin aims noted in *United States v. California*, 332 U.S. at 39–40, 67 S.Ct. at 1668–69. When private citizens bring suit, their actions must be viewed partly from the position of a government enforcer and partly from the perspective of private parties. The former is relevant to their status as one who seeks the

alleged polluter's compliance with the FWPCA, *see* 33 U.S.C. § 1251(e) (encouraging public participation in the enforcement process). The latter is relevant to the actual circumstances which might justify the doctrine.

27. Surely defendant, which claims a good faith effort at compliance, would prefer not to be sued than to be sued. It would be hard pressed to argue that in the face of its effort plaintiffs should have sued earlier. Although, in retrospect, defendant might have preferred that plaintiffs had filed their suit earlier, it cannot be assumed that plaintiffs' failure to do so was intended to increase defendant's liability or to convey the false impression that the numbers were agreed to be merely goals.

conclusions as to the meaning of the Permit. Its noncompliance with the Permit limitations was not induced by plaintiffs. It has produced no evidence to the contrary. *Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (in opposing summary judgment motion, non-moving party may not rely on factually unsubstantiated conclusory allegations); *accord Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). There is thus no question of fact as to any prejudice to defendant from the time of plaintiffs' filing of this complaint.

### 7. *Upset*

Defendant argues that a number of its violations were upsets for which penalties should not be imposed. An upset is defined as "an exceptional incident in which there is an unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation." [28] 40 C.F.R. § 122.-41(n)(1). If properly recorded in the company's log, with timely notice to the applicable authorities, and proof that the permittee attempted to remedy the situation, § 122(n)(3), such an upset will constitute an affirmative defense to an action for noncompliance. § 122.41(n)(2).

Plaintiffs argue initially that this defense is unavailing, as Connecticut had not adopted an upset defense when the violations alleged in the complaint occurred. And, as the law allows a state to adopt stricter regulations than those imposed under the FWPCA, *Mianus River,* 541 F.2d at 906; 40 C.F.R. § 123.25(a)(12),[29] *see Student Public Interest Research Group v. AT & T Bell Lab.,* 617 F.Supp. 1190, 1204 (D.N.J.1985); *P.D. Oil & Chemical,* 627 F.Supp. at 1086, Connecticut's failure to adopt such an upset defense must be con-

strued to indicate a desire to impose stricter regulations. Additionally, plaintiffs argue that defendant is precluded from raising the upset defense, as such was not made on express condition of the Permit or referenced with specific citation to the federal regulations and accordingly is not a defense to defendant's past discharges. *See AT & T Bell Lab.,* 617 F.Supp. at 1204 (failure of defendant's permit to provide for a reference upset defense invalidates defense. Section 122.41, 44 C.F.R., requires that "[a]ll conditions applicable to NDPES permits shall be incorporated into the permits either expressly or by reference. If incorporated by reference, a specific citation to these regulations (or the corresponding approved state regulations) must be given in the permit."). Defendant argues that Connecticut's failure to adopt the upset defense until 1986 is not fatal to its claim as such a defense was implicit. Defendant's Memorandum at 41–42 and Supplemental Memorandum at 15, citing *American Petroleum Institute v. EPA,* 661 F.2d 340, 350–52 (5th Cir.1981); *Marathon Oil Co. v. EPA,* 564 F.2d 1253, 1272 (9th Cir.1977); *FMC Corp. v. Train,* 539 F.2d 973, 986 (4th Cir.1976).

While the cases cited by defendant do support the general proposition that the permittee should not be held accountable for occasional, accidental discharges beyond the proscribed limits, all three cases provide little support as each involved federal enforcement and did not consider the states' rights to impose stricter standards.

 Connecticut chose not to draft its regulations until 1986. While its inaction prior to 1986 might be assumed to reflect an intention to refrain from adopting an upset defense and thereby exercise the right to adopt a stricter standard of compliance as federal law permitted, it might likewise be assumed that it intended to rely on the regulations promulgated in Title 40 C.F.R. when issues involving the state NDPES program arose. Indeed, the history of the state NDPES program is

---

**28.** *See also* Conn.Agencies Regs. 22a–430a(m) (1986).

**29.** The DEP adopted the upset defense in July 1986. *See* Conn.Agency Regs. 22a–430m.

unclear. On the one hand, applying the analysis adopted by *AT & T Bell Lab.*, 617 F.Supp. at 1204, that history suggests that the state implicitly rejected the upset defense. The March 10, 1983 Order at 11, for instance, provides that it was subject to all the NDPES General Conditions adopted on April 27, 1979. An upset defense was not listed as one of those conditions. On the other hand, the fact that the state adopted the upset defense in 1986, while at the same time imposing stricter effluent limitations on polluters, calls into question the soundness of plaintiffs' argument that the state's inaction was really a sanctioning of stricter limitations. Furthermore, the fact that the upset defense was adopted as one of many conditions applicable to the administration of the state NDPES program suggests that the regulations promulgated in 1986 were just a codification of the way the DEP had operated up until that time. Nonetheless, these issues need not be reached, for even if the defense were adopted, defendant's conclusory statements that it met the conditions for invoking this defense, without factual support, fail to raise the material question of fact precluding summary judgment. The burden for proving this defense is on defendant and the record here does not establish either the necessary factual basis for the defense nor defendant's compliance with the notice requirements specified in the federal regulations which pertain to the defense.[30]

### 8. *Numerical Errors*

Defendant also claims that factual questions are raised as to the accuracy of the number of violations. It claims that plaintiffs overstated the number by 34 in Table I of Attachment E to their summary judgment motion and by 23 in their notice letter as attached to their complaint. Plaintiffs admit that they miscalculated as to 13 violations in their notice letter but has not responded to defendant's remaining claims.[31] The parties shall recalculate the DMRs to determine inconsistencies, if any, and report their findings to the court on or before June 5, 1987.

### 9. *Overstated Amounts*

Defendant also argues that many of the numbers reported in its DMRs cannot be held to constitute violations because of possible reporting inaccuracies. Most courts that have considered this argument have rejected it. *Atlantic States Legal Foundation v. Al Tech Specialty Steel Corp.*, 635 F.Supp. 284, 289 (N.D.N.Y.1986) (claim of measurement error insufficient to defeat summary judgment "for the simple reason that a defendant could always claim that [its] reports ... were inaccurate"); *Raymark Indus.*, 631 F.Supp. 1283, 1285–86 (D.Conn.1986) (claim of monitoring inaccuracy insufficient to defeat summary judgment; court would otherwise have to reanalyze technical requirements of permit); *Job Plating Co.*, 623 F.Supp. at 218 n. 12 (factually unsupported claim of measurement error insufficient to defeat summary judgment); *AT & T Bell Lab.*, 617 F.Supp. at 1205 (same); *Sierra Club v. Simkins Indus.*, 617 F.Supp. 1120, 1127–28 (D.Md. 1985) (same). *But see Friends of the*

---

**30.** Section 122.41(n)(4), 44 C.F.R., places the burden of proof on the permittee to show compliance with the conditions of the upset defense. Defendant allegedly "provided prompt notice of the upset condition to representatives of the State of Connecticut as per NDPES permit reporting requirements and Connecticut policy regarding reporting of such events, or representatives of the state were otherwise made aware of the upset conditions." Affidavit of Robert Compaigne at 9, ¶ 11. Unless "prompt notice" means within twenty-four hours, however, such notice would be ineffective for federal regulatory purposes and defendant would be precluded from relying on this defense. 40 C.F.R. § 141(n)(3)(iii). *See also* Conn.Agencies Rep. 22a–430(m)(2)(B) and (j)(8)(D) (requiring notice

within two hours of becoming aware of circumstances or next day if notice is ascertained outside normal business hours if "(i) noncompliance is greater than two times the permitted level or (ii) the condition may endanger human health").

**31.** The inclusion of the September 1984 violation of 2, 4 Dioclorphenol, Notice Letter at 4, 6, was proper. Defendant has not alleged any facts which suggest that the customary way of rounding numbers of .5 or higher to the next largest whole number is used. *See also, CFE v. Stewart-Warner Corp.*, 631 F.Supp. 1286, 1288 (D.Conn.1986) (a violation is a violation no matter how statistically insignificant).

*Earth v. Facet Enterprises, Inc.*, 618 F.Supp. 532, 536 (W.D.N.Y.1984) (summary judgment denied where factual question presented as to accuracy of DMRs, i.e., typographical errors).

Defendant's basis for its argument is credible. In April of 1984, the EPA took samples of defendant's effluent for 10 days. Defendant took similar samples for 8 of those 10 days. Defendant analyzed the effluent using the same procedure it had used since 1981—Gas Chromatography/Conventional Detector ("GC/CD"). The EPA used a more sophisticated analysis called Gas Chromatography/Mass Spectroscopy ("GC/MS"). The distinction between the two is that the latter converts the molecules into gaseous ions which, when passed through an electrical charge, fragment into smaller ions. The ionization/fragmentation process allows the tester to determine each compound present. The process can be further refined through the introduction of isotopes. *See* Affidavit of James Morris at ¶¶ 4–6. The test results used under each system were compared and illustrated that defendant's results for the samples tested were generally higher because defendant's process read other compounds that could not be distinguished—an effect known as coelution. *Id.* at ¶ 7(c). For example, the five-day biological oxygen demand ($BOD_5$)—a test which determines "the amount of oxygen which wastewater will consume when exposed to bacteria ... *viz*, a measure of the potential of the waste to deplete oxygen from the receiving strain" *id.* at ¶ 8—resulted in readings approximately 6.6. times higher than the readings from the EPA studies. *Id.*[32]

■■■■ Defendant has produced credible evidence to support its claim that the DMRs might be overstated. Nevertheless, defendant's argument conflicts with the basic notion of strict liability in FWPCA enforcement. No scientific measurement is absolutely perfect. *AT & T Bell Lab.*, 617

F.Supp. at 1205. Any scientific process is capable of refinement and improvement. Nonetheless, Congress did not intend the courts to be the forums for determining the adequacy or inadequacy of scientific measurements, just as it did not intend the courts to be the forum to decide the assessment of effluent limitations and schedules of compliance. *See Bethlehem Steel Corp.*, 608 F.Supp. at 451–52. Defendant was required to monitor its discharges, 40 C.F.R. § 122.41(j), and attest to the accuracy of its reports, 40 C.F.R. § 122.22(d). In fulfillment of those obligations it chose to rely on GC/CD testing system. It may not now refute its own report on the results of its testing. Accordingly, although a basis for defendant's challenge of the accuracy of its reports may exist as a matter of fact, that defense has no basis as a matter of law. If an entity reports a pollution level in excess of the Permit limits, it is strictly liable, as Congress has manifested an intention that the courts not reconsider the effluent discharge levels reported. Defendant cannot preclude summary judgment by reliance on this claim.[33] However, as noted *supra* in relation to defendant's good faith efforts to cooperate with the DEP, this ruling does not preclude consideration of evidence of the reporting of higher discharge levels than actually existed when the appropriate remedy is determined.

### 10. *No Discharge or De minimus Discharge*

■■■■ Defendant next argues that on certain days during the five year period some of its wastewater was directed to the North Haven publicly owned treatment works ("POTW") and there was no discharge into navigable waters. Title 33 U.S.C. §§ 1311(a), 1324 and 1362(7), when read in conjunction with each other and § 1362(12), prohibit the discharge of pollutants into the *navigable waters* of this nation except as authorized in applicable

---

**32.** Defendant has also argued that other of its effluent calculations were overstated. *See* Affidavit of James Morris at 13–15; Defendant's Memorandum at 49–50.

**33.** This ruling makes no judgment as to the propriety of this claim when the inaccuracy allegedly resulted from clerical or typographical errors.

NDPES permits. *See generally United States v. Riverside Bayview Homes, Inc.,* 729 F.2d 391 (6th Cir.1984), rev'd on other grounds, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *United States v. Earth Sciences, Inc.,* 599 F.2d 368 (10th Cir.1979). Accordingly, on those occasions when defendant discharged pollutants into the POTW it cannot have violated the FWPCA.[34] This ruling does not reach those occurrences, however, when defendant discharged only a de minimis amount of wastewater into the river. The FWPCA does not distinguish between small discharges and large discharges. To the extent, in whatever amount of wastewater was discharged into the river, defendant exceeded the effluent limitations on a given day, a violation occurred.

SO ORDERED.

---

**34.** Plaintiffs have not alleged state claims. *See* Conn.Agencies Regs. 22a–430–4(t) and –3(*l*).